Gilbert H. OLVEDA, Jr., and Brendalee Olveda–North, Individually and As Representatives of the Estate of Freida Hernandez, Deceased, Appellants,

v.

Rene A. SEPULVEDA, M.D., and Baptist Health System d/b/a St. Luke's Hospital and St. Luke's Baptist Hospital, an Assumed Name, Appellees.

No. 04–03–00319–CV.

Court of Appeals of Texas, San Antonio.

May 26, 2004.

Rehearing Overruled June 24, 2004.

Thomas H. Crofts, Jr., Jacqueline M. Stroh, Crofts & Callaway, P.C., Dennis C. Peery, Tyler & Peery, San Antonio, for appellants.

Edward C. Mainz, Jr., Robert R. Biechlin, Jr., Thornton, Summers, Biechlin, Dunham & Brown, L.C., Richard N. Francis, Jr., Laura A. Cavaretta, Plunkett & Gibson, Inc., San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

## OPINION

KAREN ANGELINI, Justice.

Gilbert H. Olveda, Jr., and Brendalee Olveda–North ("the Olvedas"), individually and as representatives of the estate of Freida Hernandez, appeal the trial court's dismissal of their claims against Rene A. Sepulveda, M.D., and Baptist Health System ("Hospital"). According to the trial court, the expert reports filed by the Olvedas do not comply with the statutory requirements of the Texas Medical and Insurance Improvement Act ("Act"). The Olvedas disagree. They present three issues on appeal, arguing that: (1) the obstetric anesthesiologist who provided an expert report for the Olvedas is qualified to testify on the standard of care for urologists because the urologist in this case deviated from a standard of care common to all physicians; (2) a nurse's expert report coupled with a physician's expert report constitutes a good-faith effort to fairly summarize the nursing malpractice claim; and (3) the trial court prematurely dismissed the Olvedas' claims because the parties' docket control order modified the deadline for providing expert reports. We affirm the judgment of the trial court.

### BACKGROUND

On November 20, 2001, Frieda Hernandez went to the Hospital. Hernandez was approximately thirty weeks into her pregnancy and had been experiencing severe abdominal pain off and on for four days. Peter V. Kuhl, M.D., Hernandez's obstetrician, consulted with Sepulveda, a urologist,

regarding the performance of a surgical procedure. Kuhl, Sepulveda, and Ricardo A. Ramirez, M.D., an anesthesiologist, were present during the procedure. During the course of the procedure, the fetus died, and doctors performed a cesarean section to deliver the fetus. Three days later, Hernandez died due to multiple organ failure caused by HELLP syndrome.[2]

The Olvedas, Hernandez's adult children, bought suit against Kuhl, Sepulveda, Ramirez, and the Hospital for negligence relating to the improper care and monitoring of Hernandez's fetus and the improper care and treatment of Hernandez. Sepulveda and the Hospital moved to dismiss, arguing that the expert reports filed by the Olvedas do not comply with the Act. The trial court granted the motions and severed the claims against Sepulveda and the Hospital from the remainder of the suit. The Olvedas timely appealed.

The Olvedas have filed a motion to vacate the portion of the judgment and dismiss the portion of the appeal relating to the Hospital. We grant the Olvedas' motion. Accordingly, the only issue before us is the trial court's dismissal of the Olvedas' claims against Sepulveda.

## STANDARD OF REVIEW

■ We review a trial court's decision to dismiss a claim under section 13.01(e) of the Act under an abuse of discretion standard. *Am. Transitional Care Ctrs., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). When reviewing matters committed to a trial court's sound discretion, a court of appeals may not sub-

2. HELLP syndrome is a variant of preeclaimpsia characterized by hemolysis (the

stitute its own judgment for that of the trial court's. *Id.*

## EXPERT REPORTS UNDER 4590i

Article 4590i of the Act requires a medical malpractice plaintiff to furnish each defendant physician or health care provider with one or more expert reports no later than the 180th day after the lawsuit is filed. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d) (Vernon Supp.2003). The written report must provide a fair summary of the expert's opinions regarding the applicable standard of care, the breach of that standard by the physician or health care provider, and the causal relationship between the breach and the injury. *See id.* at § 13.01(r)(6). If the plaintiff fails to furnish a suitable expert report to a medical malpractice defendant within the 180–day time period, upon the filing of a motion challenging the existence or adequacy of such a report, the statute directs the trial court to enter an order dismissing the lawsuit. *See id.* at § 13.01(e)(3).

■ Additionally, the party offering the expert's testimony bears the burden of proving that the witness is qualified under Texas Rule of Evidence 702. *Broders v. Heise,* 924 S.W.2d 148, 151 (Tex.1996). The rule requires that experts be qualified "by knowledge, skill, experience, training, or education," and that their testimony "assist the trier of fact" regarding the specific issue before the court. *Id.* at 153; *see also* TEX.R. EVID. 702.

Here, the Olvedas offered the expert opinion of Maya S. Suresh, M.D., an obstetric anesthesiologist. According to Suresh, Hernandez received substandard medical care from Sepulveda, a urologist. Specifically, Suresh states:

breaking down of red blood cells), elevated liver enzymes, and a low platelet count.

[T]here was no evidence of documentation of history and physical examination, assessment[,] or plan of action by Dr. Sepulveda. A reasonable expectation of any physician/surgeon who is planning a nonobstetric operative procedure on a parturient in the third trimester is to evaluate, assess[,] and document a history [and] physical examination [and to] rationalize the plan of action. Further, it is the responsibility of all physicians involved in the intraoperative care of the parturient to ensure both maternal and fetal well[-]being during the entire [intraoperative] procedure.

... Dr. Sepulveda's lack of documentation, failure to obtain laboratory work[,] i.e., CBC (especially with the history of blood in the urine), and ignoring fetal well[-]being ... demonstrates substandard medical care. Failure to make the initial critical diagnosis of preeclampsia and HELLP impacted all subsequent management. Further failure on the part of Dr. Kuhl, Dr. Ramirez, and Dr. Sepulveda to appropriately monitor the uterine contractions and the FHR resulted in adverse fetal outcome....

....

In summary, it is my opinion that the physicians involved in Ms. Frieda Hernandez's care on November 21st, i.e., Dr. Kuhl, Dr. Ramirez, and Dr. Sepulveda, failed to follow the standard of care in the management of both Ms. Frieda Hernandez and the baby....

Had the obstetrician, anesthesiologist, and urologist followed the standard of care—i.e., obtained appropriate laboratory tests [and] evaluated and assessed the patient in a timely manner, it would have resulted in making the correct diagnosis of preeclampsia/HELLP syndrome[, and] the plan of action and management would have been the standard of care that is routinely rendered to a preeclampsia patient, which would have resulted in a positive outcome and survival of both mother and baby.

■ The Olvedas argue that this report is sufficient. According to the Olvedas, the report demonstrates that Suresh is amply qualified to testify because the urologist in this case deviated from a standard of care common to all physicians. It is not enough, however, for Suresh to state that all physicians should be able to diagnose preeclampsia. Under *Broders*, "[w]hat is required is that [the Olvedas] establish that [Suresh] has 'knowledge, skill, experience, training, or education' regarding the [standard of care applicable to urologists] which would qualify [her] to give an opinion on that particular subject." *Broders*, 924 S.W.2d at 153.

The Olvedas contend that Suresh is qualified under the authority of *Blan v. Ali*, 7 S.W.3d 741 (Tex.App.-Houston [14th Dist.] 1999, no pet.). In that case, the court held that a neurologist was qualified to testify regarding the standard of care applicable to any physician who undertakes to treat and care for a patient suffering from a stroke along with the neurological complications of lupus cerebrids. *Id.* at 746–47. The court noted, "[A] medical witness who is not of the same school of practice may be qualified to testify if he or she has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those that confronted the defendant charged with malpractice." *Id.* at 745. "[I]f a subject of inquiry is substantially developed in more than one field, a qualified expert in *any* of those fields may testify." *Id.* (emphasis in original).

Here, however, Suresh never states that the diagnosis of preeclampsia/HELLP syndrome is substantially developed in the field of urology or that she has practical

knowledge of how urologists treat patients with symptoms of both a urological condition and preeclampsia/HELLP syndrome. She states only that she is familiar with practice guidelines in anesthesiology and the standard of care in obstetrics.

Suresh may be qualified to opine that the standard of care requires a urologist to diagnose preeclampsia; however, those qualifications must appear in her report. *Hansen v. Starr*, 123 S.W.3d 13, 20 (Tex. App.-Dallas 2003, pet. denied) (noting expert must show qualifications in report). Here, Suresh's report does not refer to any knowledge, skill, experience, training, or education regarding the standard of care applicable to urologists. Accordingly, we hold that the trial court did not abuse its discretion in concluding that Suresh is not qualified to testify about Sepulveda's actions. *See Richburg v. Wolf*, 48 S.W.3d 375, 377–78 (Tex.App.-Eastland 2001, pet. denied) (noting report sets forth standard of care applicable to all physicians but fails to address qualifications of expert to address standard of care applicable to breast reconstruction surgery by setting forth expertise in that field). We overrule this issue on appeal.

■ The Olvedas also argue that Suresh is qualified to render an opinion on Sepulveda's alleged failure to properly monitor the fetus during surgery. Suresh's opinion that Sepulveda was negligent, however, is based on Sepulveda's failure to diagnose preeclampsia, not his failure to properly monitor the fetus. Suresh never alleges that the fetus would have survived if properly monitored during surgery *had preeclampsia remained undiagnosed*. Accordingly, even if Suresh is qualified to render an opinion that Sepulveda failed to properly monitor the fetus during surgery, such opinion fails to establish "the causal relationship between [the breach] and the injury." *See* Tex.Rev.Civ. Stat. Ann. art.

4590i, § 13.01(r)(6) (Vernon Supp.2003). We overrule this issue on appeal.

### Nursing Malpractice Claim

The Olvedas next argue that the trial court erred in dismissing their nursing malpractice claim because a nurse's expert report coupled with a physician's expert report constitutes a good-faith effort to fairly summarize the claim. This claim, however, was part of the suit against the Hospital. Because we are granting the Olvedas' motion to dismiss the portion of the appeal relating to the Hospital, we need not address this issue.

### Premature Ruling

■ In their final issue, the Olvedas contend that the trial court prematurely ruled on the sufficiency of the expert reports because the deadline for filing the reports in the parties' docket control order had not expired.

Expert reports must be filed within 180 days from the date a health care liability claim is filed. Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(d) (Vernon Supp.2003). The parties may agree to extend the 180–day deadline, but such an agreement must be signed by the parties and filed with the court. *Id.* at § 13.01(h).

Here, the Olvedas filed their claim June 13, 2002. They filed expert reports in September. The deadline for filing the expert reports was December 10, 2002. On January 8, 2003, the trial court entered a docket control order, stating, "Plaintiffs shall designate any and all expert witnesses and provide curriculum vitaes and reports of retained experts on or before June 11, 2003."

In *Finley v. Steenkamp*, 19 S.W.3d 533, 539–40 (Tex.App.-Fort Worth 2000, no pet.), the court considered an argument similar to the one made by the Olvedas.

In that case, Finley argued that the 180–day deadline was replaced by the trial court's scheduling order. *Id.* at 539. The court rejected this argument for numerous reasons. *Id.* First, the court noted that the scheduling order did not issue until a month after the deadline had passed for filing the expert report. *Id.* Second, the scheduling order did not designate a later date as a deadline to file expert reports but specified a date on which Finley was required to provide the name of expert witnesses expected to testify at trial. *Id.* at 539–40; *see also Tesch v. Stroud,* 28 S.W.3d 782, 789 (Tex.App.-Corpus Christi 2000, pet. denied) (rejecting argument for extending 180–day deadline based on proposed scheduling order that was not signed by appellee's counsel and only addressed discovery deadlines for designating experts).

Similarly, the scheduling order in this case issued approximately one month after the 180–day deadline passed. Furthermore, the order mentions expert witnesses and "retained" experts, indicating testifying experts. Additionally, the order states that the agreement regarding the deadlines was "to facilitate orderly and efficient discovery and preparation for trial." For these reasons, we do not believe that this order was meant to include expert reports under the Act. Accordingly, we hold that the trial court did not act prematurely in dismissing the Olvedas' claims.

## CONCLUSION

We dismiss the portion of the appeal relating to the Hospital and vacate the portion of the trial court's judgment dismissing the claim against the Hospital. We affirm the remainder of the trial court's judgment.

ALMA L. LÓPEZ, Chief Justice, dissenting.

I agree with the majority that Suresh's report was not sufficient to show that she was qualified to opine that the standard of care applicable to a urologist would require a urologist to diagnose preeclampsia. I disagree, however, that Suresh's report was insufficient to meet the requirements of 4590i with regard to Sepulveda's negligence in failing to monitor the fetus. Suresh's report states that the nurse "voiced concern about the fetal [heart rate monitoring] strip and fetal decelerations." The nurse accompanied the patient to the operating room and "again voiced concern over the patient's fetal strip." Suresh further notes, "In preeclampsia, the fetus is at increased risk owing to marginal placental function which may become inadequate in the presence of increased uterine activity. Pre-operatively, there was evidence of uterine contractions and fetal decelerations and despite the nurse voicing her concerns—electronic fetal monitoring and surveillance was abandoned on the patient's arrival to the operating room." Suresh states that Sepulveda's actions in "ignoring fetal well being also demonstrates substandard medical care."

The majority contends that because Suresh "never alleges that the fetus would have survived if properly monitored during surgery *had preeclampsia remained undiagnosed,*" Suresh's opinion "fails to establish 'the causal relationship between [the breach] and the injury.'" However, Suresh states in her report that the "standard of care would have been to monitor uterine contractions and have continuous reading of [the fetal heart rate] by a qualified individual during the perianesthetic and preoperative period and to have arrangements for a stat cesarean section if the need arose." Thus, Suresh opines on causation because if the standard of care had been met, and the fetal heart rate had been monitored, a stat cesarean section could have been performed to save the

fetus if the need arose. The failure to monitor the heart rate led to the failure to perform the stat cesarean section, thereby preventing the fetus from surviving.

Accordingly, I believe Suresh's report adequately summarizes the breach of the applicable standard of care with regard to the monitoring of the fetus and sets forth the causal relationship between the breach and the inability of the fetus to survive. Because the majority holds to the contrary, I respectfully dissent from this portion of the majority's opinion.