Affirmed and Memorandum Opinion filed July 26, 2007








Affirmed and Memorandum Opinion filed July 26, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-01102-CV

____________

 

DAMIAN CHAUPIN, M.D., Appellant

 

V.

 

MELISSA SCHROEDER, INDIVIDUALLY AS
WRONGFUL DEATH BENEFICIARY OF ZANE SCHROEDER, DECEASED, ON BEHALF OF ALL
WRONGFUL DEATH BENEFICIARIES OF ZANE SCHROEDER, DECEASED, AND AS ADMINISTRATOR
OF THE ESTATE OF ZANE SCHROEDER, DECEASED, Appellee

 



 

On Appeal from Probate
Court No. 2

Harris County, Texas

Trial Court Cause No. 347,996-402

 



 

M E M O R A N D U M   O P I N I O N








This is a health care liability lawsuit governed by chapter
74 of the Texas Civil Practice & Remedies Code.  Tex. Civ. Prac. & Rem. Code Ann. ' 74.001-.507
(Vernon 2005 & Supp. 2006).  Damian Chaupin, appellant and a defendant
below, brings this interlocutory appeal from the trial court=s denial of his
motion to dismiss, which was based on the alleged inadequacy of the preliminary
expert report prepared by Robert Schoene and filed by appellee/plaintiff,
Melissa Schroeder, individually as wrongful death beneficiary of Zane
Schroeder, deceased, on behalf of all wrongful death beneficiaries of Zane
Schroeder, deceased, and as administrator of the estate of Zane Schroeder,
deceased.  See id. ' 51.014 (Vernon Supp. 2006) (authorizing
interlocutory appeal).  On appeal, Chaupin contends that (1) Schoene was not
qualified to offer the opinions in the report, and (2) the report was
inadequate regarding the standard of care, the alleged breach of the standard,
and the causal connection between the alleged breach and the alleged damages. 
We affirm.

I.  Course of Events

On March 7, 2004, Zane Schroeder was admitted to Houston
Northwest Medical Center complaining of severe back and abdominal pain and
abdominal tension.[1] 
Chaupin examined him and concluded that he had a severe ileus, or intestinal
obstruction.[2] 
Chaupin ordered a nasogastric tube placed and ordered Mr. Schroeder=s oxygen levels
monitored with a pulse oximeter.  He also instructed that he was to be notified
if the levels fell below 94 percent.  During the night, Mr. Schroeder=s pulmonary rate
was uneven and rapid.  He was placed on an oxygen mask, but even with
supplemental oxygen, his oxygen levels fluctuated between 90-95 percent.  An
X-ray taken the next morning showed his lungs to be hypoinflated, apparently
due to an inability to take a full breath.








Chaupin again examined Mr. Schroeder at 9:30 a.m.,
indicating in a progress note that he had oxygen levels at 93-96 percent.  He
further indicated that he would re-examine the patient after a CT scan was
performed.  Dr. Bhavesh Bhatt, a pulmonologist, examined Mr. Schroeder at
11:30, noting oxygen levels of 90-92 percent.  He recommended transfer to the
intensive care unit and ordered a stat (i.e., immediate) arterial blood
gas test.  Subsequently, Dr. Jefy Mathew was called to evaluate Mr. Schroeder
for respiratory failure.  When the arterial blood gas results arrived, Matthew
decided to intubate due to Aimpending respiratory failure.@

After two failed intubation attempts, the second of which
apparently entered the esophagus, Mathew ordered a stat surgery and anesthesia
consult.  After a third failed intubation, cardiopulmonary resuscitation had to
be performed.  At that point, Dr. Bethea, an anesthesiologist and emergency
room physician, arrived and attempted one last intubation.[3] 
After this attempt also failed, Chaupin, who had also arrived, performed a
cricothyroidotomy (an incision into the airway to assist breathing), and CPR
continued.  Mr. Schroeder was pronounced dead at 1:50 p.m.  An autopsy
identified the cause of death as an air embolism and stated that the most
likely source was the wound created by the cricothyroidotomy.

II.  Schoene=s Report

Melissa Schroeder (Aplaintiff/appellee@) filed suit
alleging negligence against Chaupin, Mathew, Bhatt, and Houston Northwest,
among others.  Pursuant to chapter 74 of the Texas Civil Practice and Remedies
Code, she served the report of Schoene, a pulmonologist and internist, on each
defendant.








In his report, Schoene listed extensive qualifications,
including current and former teaching and practicing positions, as well as
numerous articles and memberships, primarily focusing on pulmonary medicine.  He
stated that he has been practicing medicine in an area relevant to this case
and has trained and consulted with health care providers licensed in the same
fields as doctors Mathew, Bhatt, and Chaupin.  He further stated that by virtue
of his education, training, experience, and board certifications, he is
familiar with the accepted standards of care for the treatment at issue in this
case.  Schoene=s curriculum vitae supports these assertions with the
details of numerous teaching and practicing positions, extensive training, and
certifications in internal medicine and pulmonary disease.

Among the criticisms Schoene made in his report was that
Chaupin had the opportunity to properly evaluate Mr. Schroeder and Ainstitute routine
and accepted medical interventions that would have, in reasonable medical
probability, prevented his death.@  He opined that
pulse oximeters are often inaccurate and unreliable because they measure only
oxygenation, not ventilation, and they cannot detect changes in oxygen tension
until levels  fall low enough to cause a change in the saturation of the
hemoglobin.  He states that by the time a blood gas was finally drawn on Mr.
Schroeder, his pulse oximeter reading showed an oxygen level of 90.4 percent,
when his actual oxygen level at the time was only 67.4 percent, well below the
normal level of 80-100 percent.  Further, the amount of carbon dioxide in the
blood was elevated, and the pH was markedly acidotic.








Based on these assessments, Schoene opined that under the
circumstances, Chaupin Afell below the standard of care by relying
on the inaccuracy of the pulse oximeter readings and not obtaining an arterial
blood gas.@  Had a blood gas been drawn earlier, according to
Schoene, the Atrue nature of [Mr. Schroeder=s] poor pulmonary
function and deteriorating status would have been recognized and he could have
received more aggressive care for his worsening ileus to improve his
respiratory status or a safe, well planned intubation to ensure proper
oxygenation.@  He further states that Chaupin violated the standard
of care by inaccurately assessing Mr. Schroeder=s condition,
suggesting Chaupin failed to correctly read  and react to vital signs and
physical symptoms.  This failure to accurately assess, in turn led to Chaupin=s failure to (1)
recognize that the attempts to decompress the ileus were not working and (2)
immediately institute other medical procedures, such as a well-planned 
intubation, that would have improved Mr. Schroeder=s deteriorating
condition before an emergency intubation became necessary.

Further, regarding causation, Schoene stated as follows:

 

In reasonable medical probability, by allowing Mr.
Schroeder to sit around for 18 hours before an arterial blood gas was obtained,
Dr. Chaupin allowed Mr. Schroeder to deteriorate to a point where the
intubation became necessary.  In addition, Dr. Chaupin=s failure to decompress Mr.
Schroeder=s abdomen caused Mr. Schroeder to
suffer intense, unrelieved abdominal pain, with expansion of his intestines and
stomach to the point where, in reasonable medical probability, it impeded his
ability to achieve adequate oxygenation and ventilation by preventing his
diaphragms from moving up and down with his breathing.  This caused his O2
saturation to drop, and, in reasonable medical probability, resulted in
respiratory distress and the failed intubation attempts which led, in the
natural sequence of events, to Mr. Schroeder=s death.

. . . .

In this case, it
is especially distressing that not only did Mr. Schroeder not have to die, but
his last 18 hours were spent in excruciating pain.  Dr. Chaupin, Dr. Bhatt, Dr.
Matthew [sic] and the Houston Northwest Medical Center, each had numerous
opportunities to help Mr. Schroeder and save his life.  Instead, no one acted
with any urgency during his hospitalization.  While his pain grew, his abdomen
expanded and became more tense and swollen, his ileus worsened, and his
oxygenation never reached normal levels.  As a result, Mr. Schroeder died needlessly.

As
stated, the trial court denied Chaupin=s motion to
dismiss based on Schoene=s qualifications and the adequacy of the
report.

III.  Standards of Review








We utilize an abuse of discretion standard in reviewing a
trial court=s decision on a motion to dismiss a case under section
74.351 of the Civil Practice and Remedies Code. Estate of Regis ex rel. McWashington
v. Harris County Hosp. Dist., 208 S.W.3d 64, 67 (Tex. App.CHouston [14th
Dist.] 2006, no pet.); see also Am. Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873, 875 (Tex. 2001) (decided under prior law).  Under
section 74.351(l), a trial court should grant a motion challenging the adequacy
of an expert report if the report does not represent an objective good faith
effort to comply with the definition of an expert report in subsection (r)(6). 
Tex. Civ. Prac. & Rem. Code Ann.
' 74.351(l). 
Subsection (r)(6) defines Aexpert report@ as a written
report providing a fair summary of the expert=s opinions
regarding the standard of care, the manner in which the care rendered by the
health care provider failed to meet the standard of care, and the causal
relationship between that failure and the harm claimed.  Id. ' 74.351(r)(6). 
Additionally, in order to provide an acceptable report, the expert must
establish that he or she is qualified to do so.  Id. ' 74.351(r)(5)(A). 
To qualify as an expert on the issue of whether a physician departed from
standards of medical care, the report and curriculum vitae must demonstrate
that he or she is a physician who:  (1) is practicing medicine at the time such
testimony is given or was practicing medicine at the time the claim arose; (2)
has knowledge of accepted standards of medical care for the diagnosis, cure, or
treatment of the illness, injury, or condition involved in the claim; and (3)
is qualified on the basis of training or experience to offer an expert opinion
regarding those accepted standards of medical care.  Id. ' 74.401(a).  In
determining whether a witness is qualified on the basis of training or
experience, the court must consider whether the witness: (1) is board certified
or has other substantial training or experience in an area or medical practice
relevant to the claim; and (2) is actively participating in rendering medical
care relevant to the claim.  Id. ' 74.401(c).








Ultimately, to constitute a good faith effort, an expert=s medical
liability report must establish the expert=s qualifications,
the applicable standard of care, how that standard was breached by the
particular actions of the defendant, and how that breach caused the damages
claimed by the plaintiff.  See, e.g., Palacios, 46 S.W.3d at 878-79. 
The report must do more than merely state the expert=s conclusions; it
must be sufficiently explicit to: (1) inform the defendant of the specific
conduct that is being called into question; and (2) provide a basis for the
trial court to conclude that the plaintiff=s claims have
merit.  Id. at 879.

IV.  Schoene=s Qualifications

In his first issue, Chaupin contends that Schoene was not
qualified to offer the opinions contained in his report.  Specifically, Chaupin
asserts that Schoene, a pulmonologist and internist, has demonstrated no
expertise qualifying him to assess the conduct of Chaupin, a general surgeon,
regarding treatment of a possible ileus with abdominal distension and pain.

Chaupin is correct in noting that not every physician
automatically qualifies as an expert in every area of medicine.  See Broders
v. Heise, 924 S.W.2d 148, 152 (Tex. 1996).  However, it is equally true
that to be qualified as an expert in a particular case, a physician need not be
a practitioner in the same specialty as the defendant.  See id. at 153; see
also Blan v. Ali, 7 S.W.3d 741, 745 (Tex. App.CHouston [14th
Dist.] 1999, no pet.).  Instead, the test is whether the offering party has
established that the expert has knowledge, skill, experience, training, or
education regarding the specific issue before the court that would qualify the
expert to give an opinion on that particular subject.  Roberts v. Williamson,
111 S.W.3d 113, 121 (Tex. 2003).  Specifically for preliminary expert reports
under chapter 74, the report itself, together with the attached CV, must
demonstrate that the physician has knowledge of accepted standards of medical
care for the diagnosis, cure, or treatment of the illness, injury, or condition
involved in the claim and is qualified on the basis of training or experience
to offer an expert opinion regarding those accepted standards.  See Tex. Civ. Prac. & Rem. Code Ann. ' 74.401(a).  If a
particular subject is substantially developed in more than one medical field, a
qualified physician in any of those fields may testify.  Broders, 924
S.W.2d at 152; Blan, 7 S.W.3d at 745-46.  Furthermore, if the subject is
common to and equally recognized and developed in all fields of practice, any
physician familiar with the subject may testify as to the standard of care.  E.g.,
Blan, 7 S.W.3d at 745-46.








Chaupin contends that the illness or condition at issue in
this case is an ileus.[4] 
He states that surgeons treat ileus and pulmonologists do not; thus, according
to Chaupin, Schoene cannot be qualified as an expert regarding Chaupin=s treatment of Mr.
Schroeder=s ileus.  Schoene=s report, however,
focuses on Chaupin=s reliance on a pulse oximeter to measure
Mr. Schroeder=s oxygenation and his failure to order a more reliable
arterial blood gas test.  He further criticizes Chaupin=s failure to
re-evaluate Mr. Schroeder after a CT scan was performed and his failure to
accurately assess Mr. Schroeder=s vital signs.  Schoene mentions the ileus
both in the medical history section of the report and the causation section in
the context of its being the cause of Mr. Schroeder=s respiratory
distress.[5] 
According to Schoene, although the ileus caused the onset of the respiratory
problems, Chaupin=s failure to utilize the proper blood gas
test and failure to properly evaluate and assess the patient led to the
emergency failed attempts to intubate, which led ultimately to Mr. Schroeder=s death.








Schoene=s report and CV adequately demonstrate
that he poses sufficient expertise regarding the use of blood gas tests and the
evaluation and assessment of patients undergoing pulmonary distress to opine
regarding Chaupin=s conduct in these matters.  In his
report, Schoene listed numerous teaching and practicing positions, as well as
articles and memberships, primarily focusing on internal and pulmonary
medicine.  He stated that he has been practicing medicine in an area relevant
to this case and has trained and consulted with health care providers licensed
in the same field as Chaupin.  He further stated that by virtue of his
education, training, experience, and board certifications, he is familiar with
the accepted standards of care for the treatment at issue in this case. 
Schoene=s CV generally
supports these assertions.

In Blan v. Ali, an expert opined in his report that
the standard of care he described would apply to any physician treating a
patient suffering from a stroke.  7 S.W.3d at 746.  Based on this assertion and
the expert=s demonstrated training and experience in the
treatment of strokes, we held that he was qualified to opine on the care
provided to a stroke victim by a cardiologist and an emergency room physician. 
Id. at 747.  Schoene made similar statements in his report regarding the
use of blood gas tests and the evaluation and assessment of Mr. Schroeder=s condition.
Chaupin, however, attempts to distinguish Blan by arguing that because
the expert in that case was a neurologist, he had clear expertise on
neurological conditions such as strokes, whereas Schoene does not have such
obvious expertise regarding the treatment of ileus.  But again, it is Chaupin=s treatment of Mr.
Schroeder=s pulmonary distress, not the treatment of the ileus,
that is the focus of Schoene=s criticisms.  His stated qualifications
support his expertise in making those statements, and Blan is closely
analogous to the present case.








Similarly, several courts have held that a physician with
demonstrated expertise in treating infections could offer an opinion on the
treatment of an infection by a physician from a different specialty.  See,
e.g., McKowen v. Ragston, No. 01-06-00665-CV, 2007 WL 79330, at *10 (Tex.
App.CHouston [1st
Dist.] Jan. 11, 2007, no pet.); Keeton v. Carrasco, 53 S.W.3d 13, 25‑26
(Tex. App.CSan Antonio 2001, pet. denied); Tennyson v.
Phillips, No. 12‑02‑00154‑CV, 2004 WL 63158, at *8 (Tex.
App.CTyler 2004, pet.
denied) (mem. op.).  As in Blan, the focus in these cases is on whether
the physician-expert has demonstrated expertise regarding the subject matter at
issue, not on whether he or she has expertise in the specialty of the
defendant-physician.  See McKowen, 2007 WL 79330, at *10; Keeton,
53 S.W.3d at 25‑26; Tennyson, 2004 WL 63158, at *8.  Chaupin attempts
to distinguish these cases by pointing out that they each involved
post-operative care, not pre-operative care as in the present case.  This
distinction is not meaningful.  We believe that the infection treatment cases
are very analogous to the present situation.  Although Chaupin practices a
different specialty than Schoene, the physician-expert is qualified to opine on
the defendant-physician=s conduct because he has demonstrated
expertise in the subject matter at issue.[6]

Based on the foregoing, we find that Chaupin=s arguments
regarding Schoene=s qualifications are without merit. 
Accordingly, we overrule Chaupin=s first issue.

V.  Adequacy of Report








In his second issue, Chaupin contends that even if Schoene
is qualified as an expert in this case, his statements in the report are
inadequate to establish the elements required under section 74.351.  To be
adequate, the report must state:  (1) the applicable standards of care; (2) the
manner in which the defendant=s conduct breached the standards of care;
and (3) the causal relationship between the breach and the claimed damages.  Palacios,
46 S.W.3d at 878-79.  Specifically, Chaupin contends that the report is
inadequate regarding:  (1) the standard of care relating to Chaupin=s use of blood gas
tests; (2) the causal relationship between the use of blood gas tests and the
claimed damages; (3) the standard of care relating to evaluation and assessment
of Mr. Schroeder; and (4) the standard of care and alleged breach of the
standard relating to decompression of Mr. Schroeder=s abdomen.  We
will examine each argument in turn.

A.  Blood Gas MonitoringCStandard of Care

Regarding the standard of care for blood gas monitoring,
Chaupin asserts that the report does not contain any statement of the standard
specifically applicable to him (or to surgeons), but only includes general
statements regarding Aany physician.@ However, Schoene=s statements in
the report are more specific than Chaupin suggests.  Schoene provides
significant detail and explanation regarding the proper use of pulse oximeters
and arterial blood gas tests, including why the latter is preferable to the
former under circumstances such as those presented in the treatment of Mr.
Schroeder.  It is true that among his comments on the standard of care, Schoene
says:  AThe standard of
care for any physician taking care of a patient with pulse oximeter
readings of 88-94% while on 100% non-rebreather mask requires the physician to
obtain arterial blood gases to determine the patient=s true pulmonary
status.@  (emphasis
added).  Notwithstanding the use of the Aany physician@ language of which
Chaupin complains, the report is quite specific to Chaupin and the situation he
faced in treating Mr. Schroeder and is not a generic description of amorphous
standards.  Schoene=s statements must also be read in light of
his qualifications, as stated in the report and attached CV, which include the
assertions that Schoene has been practicing medicine in an area relevant to Mr.
Schroeder=s treatment, has trained and consulted with health
care providers licensed in the same field as Chaupin, and is familiar (by
virtue of his education, training, experience, and board certifications) with
the accepted standards of care for the treatment at issue in this case.








Furthermore, we reject Chaupin=s suggestion that
a report may be deemed inadequate simply because it states that Aany physician@ would have
certain knowledge or expertise.  As we stated in Blan:  ADespite the fact
that we live in a world of niche medical practices and multilayer
specializations, there are certain standards of medical care that apply to
multiple schools of practice and any medical doctor.@  7 S.W.3d at 746;
see also In re Stacy K. Boone, P.A., 223 S.W.3d 398, 405-06 (Tex. App.CAmarillo 2006,
orig. proc.) (finding expert report was adequate on standard of care for
multiple defendants where each defendant was involved in the same type of care
and expert clearly stated and explained that the standard was the same for
each).

Chaupin cites Olveda v. Sepulveda, 141 S.W.3d 679
(Tex. App.CSan Antonio 2004, pet. denied), and  Gray v. CHCA
Bayshore L.P., 189 S.W.3d 855 (Tex. App.CHouston [1st
Dist.] 2006, no pet.), for the proposition that it is improper to apply global
standards of care to different health care providers.  However, these cases are
distinguishable from the present case.  In Olveda, the court does say
that A[i]t is not enough
. . . to state that all physicians should be able to diagnose [a particular
illness].@  141 S.W.3d at 682.  However, the point that the
court is making is not that such a statement renders the report inadequate on
standard of care, but that such a statement does not convert the opining
physician into an expert on the conduct of the defendant-physician, absent
proof that the expert was qualified based on knowledge, skill, experience,
training, or education.  See id.  Olveda turns on qualifications,
not standard of care.  As discussed above, Schoene has stated that he is
qualified based on his education, training, experience, and board
certifications to opine regarding Chaupin=s care of Mr.
Schroeder, and he has trained and consulted with health care providers licensed
in the same field as Chaupin.  Schoene=s CV also supports
these statements.








In Gray, the expert opined, without explanation,
that an identical standard of care applied to both the anesthesiologist and the
nursing staff who cared for the patient in question.  189 S.W.3d at 859.  The
court held that A[w]hile it is possible that an identical
standard of care applied to both . . . such generic statements, without more,
can reasonably be deemed conclusory.@   Id.  The
court also emphasized the abuse of discretion standard, stating that the trial
court did not act unreasonably in granting the motions to dismiss.  Id. 
Here, Schoene=s report is not merely conclusory regarding the
standard of care on blood gas testing.  As stated above, Schoene opined in some
detail as to the appropriate use of pulse oximeters and arterial blood gases. 
Accordingly, Gray is distinguishable from the present case.  Chaupin=s arguments
regarding the adequacy of the report in addressing the standard of care
relating to blood gas monitoring are without merit.

B.  Blood Gas MonitoringCCausation

Chaupin next argues that Schoene=s statements
regarding causation, as related to the blood gas tests, are inadequate.  First,
Chaupin asserts that Schoene=s blood gas-related causation statements
are Aconclusory and
[do] not establish that any breach in this regard by Dr. Chaupin caused the
injury in question.@  Chaupin then isolates one point from
Schoene=s report as being
conclusory:  where Schoene states that had an arterial blood gas been drawn
earlier, Athe true nature of [Schroeder=s] poor pulmonary
function and deteriorating status would have been recognized and he could have
received more aggressive care for his worsening ileus to improve his
respiratory status.@  This statement in itself could be
considered conclusory, at least in regard to what Amore aggressive
care@ might entail.  In
its context, however, it loses its conclusory nature:  the statement is made in
the ADeviations from
the Standard of Care@ section of the report and not in the ACausation@ section
(discussed in more detail below), and Chaupin neglects to mention the last
phrase in the quoted sentence, which reads: Aor a safe, well
planned intubation to ensure proper oxygenation.@  This concluding
phrase provides a specific measure that, according to Schoene, should have been
undertaken had the true nature of Mr. Schroeder=s pulmonary
function been known by use of an arterial blood gas rather than a pulse
oximeter.[7] 
Chaupin=s isolation of
this one partial sentence does not demonstrate that Schoene=s opinions were
deficient regarding causation.








Chaupin further argues that there exists an analytical gap Ain Dr. Schoene=s explanation of
how Dr. Chaupin=s care caused this patient to aspirate his
vomitus, or how Dr. Chaupin violated a standard of care . . . which caused the
vomiting, aspiration, or death.@  Chaupin does not, however, point to any
specific language in the report as demonstrating such a gap.  To the contrary,
reading Schoene=s report as a whole, it is clear that he
is opining that Chaupin=s failure to use the proper blood gas test
under the circumstances and failure to properly evaluate and assess Mr.
Schroeder=s condition allowed Mr. Schroeder=s condition to
deteriorate to the point where an emergency intubation became necessary. 
Schoene explains at length how difficult and dangerous the emergency intubation
attempts were and how they, in turn, led to Mr. Schroeder=s aspirating his
vomitus, which led directly to his death.

Additionally, Chaupin argues that Athe statement that
the outcome >could= have been affected by Dr. Chaupin is
insufficiently [sic] conclusory and broad.@  He further
contends that this language, amounting to no more than a suggestion of
increased risk, does not describe an actionable tort in Texas, citing Kramer
v. Lewisville Memorial Hospital, 858 S.W.2d 397, 405-06 (Tex. 1993). 
Chaupin does not, however, identify the Acould@ language that he
is referencing.  Schoene states in the report that as a result of Chaupin=s actions and
inactions (as well as those of others), AMr. Schroeder died
needlessly.@  He opines that by not using the appropriate blood
gas test and by not properly evaluating and assessing Mr. Schroeder=s condition,
Chaupin allowed Mr. Schroeder to deteriorate to a point at which the emergency
intubation attempts became necessary.  Based on these specific statements, and
the report as a whole, we do not find the causation statements to be overbroad
or conclusory.








Lastly, Chaupin complains that Schoene failed to rule out
other factors beyond Chaupin=s control as causes of Mr. Schroeder=s damages.  Such
an opinion is not required.  This case is not on appeal from a final trial or
from the grant of summary judgment.  In a preliminary expert report, the expert
is charged with identifying standards, breach thereof, and causation.  Palacios,
46 S.W.3d at 878-79.  Chaupin does not cite any cases, and we are aware of
none, further requiring the expert (beyond an affirmative explanation of
causation) to rule out other possible causes not yet raised in the case. 
Furthermore, in his report, Schoene did in fact discuss at length other conduct
by other care givers that Schoene believes also proximately caused the claimed
damages.  More than one act and more than one actor can be proximate causes of
the same damages.  See, e.g., Morrell v. Finke, 184 S.W.3d 257, 284 
(Tex. App.CFort Worth 2005, pet. abated) (A[A]ll persons
whose negligent conduct contributes to the injury, proximately causing it are
liable.@) (citing Travis
v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992)).

C.  Evaluation and AssessmentCStandard of Care

Chaupin next attacks Schoene=s statement that A[t]he standard of
care requires any physician caring for a patient to accurately evaluate and
assess the patient in order to institute necessary medical interventions.@  Chaupin argues
that this sentence:  (1) contains an impermissibly broad statement of the
standard of care; (2) provides no factual description of what should have been
done to evaluate or assess the patient in this case; and (3) does not contain a
proper statement of the legal standard because it is not based on Aordinary care.@  However, this
sentence must be read in the broader context of the report, not in isolation. 
Immediately prior to this sentence, and in the same paragraph, Schoene
criticizes Chaupin=s failure to re-evaluate Schroeder after
the CT scan was performed as well as Chaupin=s alleged notation
of inaccurate vital signs.  It is thus clear from the context that Schoene is
talking about re-evaluating Schroeder after the CT scan (and in light of the
results) and assessing his vital signs.  Schoene is not making a completely
unfocused generalization about evaluating and assessing a patient as Chaupin
suggests.  Furthermore, contrary to Chaupin=s second
assumption, it is clear from this context that Schoene is basing his statement
of the standard of care on the facts of the case at hand.








Lastly, there is no requirement of magic words such as Aordinary care@ in chapter 74. 
There is nothing in the report to suggest that when Schoene states that Athe standard of
care requires . . .@ he is referencing any standard other than
that of ordinary care.  Accordingly, we find Chaupin=s arguments
regarding Schoene=s Aevaluate and
assess@ language to be
without merit.

D.  Perceived Decompression Criticism

Lastly, Chaupin points out that in the causation section of
the report, Schoene appears to make allegations regarding Chaupin=s treatment of Mr.
Schroeder=s ileus.  Specifically, Schoene states as follows:

Dr. Chaupin=s failure to
decompress Mr. Schroeder=s abdomen caused Mr. Schroeder to suffer
intense, unrelieved abdominal pain, with expansion of his intestines and
stomach to the point where, in reasonable medical probability, it impeded his
ability to achieve adequate oxygenation and ventilation by preventing his
diaphragms from moving up and down with his breathing.  This caused his O2
saturation to drop, and, in reasonable medical probability, resulted in
respiratory distress and the failed intubation attempts which led, in the
natural sequence of events, to Mr. Schroeder=s death.








Considering the report as a whole, it was logical for the
trial court to conclude that the accusations being made by Schoene are that
Chaupin breached the standard of care by failing to order an arterial blood gas
when he should have, by failing to reevaluate Mr. Schroeder after the CT scan,
and by failing to accurately record his vital signs.  The mention of the
failure to decompress, included in the causation section, is an explanation as
to why Mr. Schroeder was in such distress.  In other words, Mr. Schroeder=s breathing
problems, according to Schoene, were a result of his discomfort from the
ileus.  Because he did not take required measures, Chaupin apparently did not
realize the extent of Mr. Schroeder=s respiratory
distress, and his failure to relieve the ileus led to Mr. Schroeder=s inability to
adequately fill his lungs.  These failures, according to Schoene, ultimately
led to Mr. Schroeder=s death.  The discussion of the
respiratory distress would be incomplete without mention of the unrelieved
ileus because it was the cause of the respiratory distress.  Accordingly, we
find Chaupin=s arguments regarding Schoene=s perceived
decompression criticism to be without merit.  We overrule appellant=s second issue.

We affirm the trial court=s judgment.

 

 

 

 

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

 

Judgment rendered
and Memorandum Opinion filed July 26, 2007.

Panel consists of
Chief Justice Hedges and Justices Fowler and Edelman.









[1]  These background facts are derived from Schoene=s report and are for purposes of this appeal only. 
Prior to arrival at Houston Northwest, Mr. Schroeder had previously undergone a
procedure at another hospital for treatment of chronic lower back pain. 
Subsequently, but prior to admission to Houston Northwest, Mr. Schroeder made
two appearances at the emergency room at Cypress Fairbanks Medical Center.  On
the second appearance, he was transferred to Houston Northwest.





[2]  AIleus,@ or Aparalytic
ileus,@ results when intestinal contents back up because of a
failure of peristalsis, or normal involuntary intestinal contractions.  Webster=s Third International
Dictionary 1125, 1682 (1993).





[3]  Bethea was not a defendant below, and his first name
does not appear in the record.





[4]  Chaupin supports this assertion by citing to
plaintiff/appellee=s petition, wherein it is alleged that Chaupin failed
to properly treat the ileus and failed to timely decompress and examine Mr.
Schroeder for surgery.  In assessing the sufficiency of a preliminary medical
report under chapter 74, a court is not to draw outside inferences but must
instead rely exclusively on the information contained within the four corners
of the report.  Gray
v. CHCA Bayshore L.P.,
189 S.W.3d 855, 859 (Tex. App.CHouston [1st Dist.] 2006, no pet.) (citing Palacios, 46
S.W.3d at 879).  However, the petition also alleges that Chaupin failed to
properly assess Mr. Schroeder=s condition, an
allegation that would appear to encompass failure to use the proper blood gas test,
as well as failure to properly evaluate Mr. Schroeder=s worsening state.

Additionally, Chaupin does not discuss
whether internists treat ileus or whether Schoene=s board certification in internal medicine, along with his stated
experience and training, would qualify him to opine regarding treatment of that
condition.  However, because of our reading of the report as opining primarily
on pulmonary issues, we need not decide this additional point.





[5]  This reading of Shoene=s report (as not focusing on the treatment of ileus) is the
interpretation put forth by the plaintiff/appellee in the trial court and on
appeal.  In other words, plaintiff/appellee is not asserting that the report
specifically covers treatment of the ileus.





[6]  Although Schoene=s
comments stray to some degree into criticism of the ileus treatment,
particularly when he suggests that Chaupin could have relieved Mr. Schroeder=s respiratory distress by properly decompressing his
abdomen, the focus of the report is clearly on the diagnosis and treatment of
the respiratory condition.  Indeed, Schoene also suggests Mr. Schroeder=s distress could have been relieved by a well-planned,
non-emergency intubation.  Accordingly, we need not and do not resolve the
question of whether Schoene has demonstrated the requisite qualifications to
opine regarding the treatment of ileus.  See n.4 supra.





[7]  It further should be noted that at no point does
Chaupin specifically argue that Schoene=s
statements regarding breach of the standard of care (as related to the
blood gas tests) are inadequate.