Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



## MEMORANDUM OPINION

No. 04-09-00027-CV

John **LELAND**, D.D.S.,
Appellant

v.

George C. **BRANDAL** and Ruth L. Brandal,
Appellees

From the 216th Judicial District Court, Bandera County, Texas
Trial Court No. CVDV-05-281
Honorable Charles Sherrill, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:       Catherine Stone, Chief Justice
               Karen Angelini, Justice
               Sandee Bryan Marion, Justice

Delivered and Filed: November 4, 2009

AFFIRMED

In this interlocutory appeal, we are once again asked to review the expert reports filed by

George Brandal and his wife, Ruth, in connection with their health care liability suit against dentist

John Leland. The facts of this case are well known to the parties and have been set out in both our

previous opinion, *see Leland v. Brandal*, 217 S.W.3d 60 (Tex. App.—San Antonio 2006), *aff'd*, 257

S.W.3d 204 (Tex. 2008), and the supreme court's opinion, *see Leland v. Brandal*, 257 S.W.3d 204

(Tex. 2008), relating to Leland's original challenge to the initial expert reports filed by the Brandals; therefore, we will not recount the facts here. The issue before this court on appeal is whether the additional expert reports filed by the Brandals in connection with the 30-day extension granted by the trial court are sufficient to comply with the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code. For the reasons that follow, we conclude the trial court did not abuse its discretion in denying Leland's motion to dismiss and affirm the trial court's order.

### STANDARD OF REVIEW

We review a trial court's decision on a motion to dismiss for an abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Valley Baptist Med. Ctr. v. Stradley*, 210 S.W.3d 770, 773 (Tex. App.—Corpus Christi 2006, pet. denied). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A lower court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Id.* at 242. However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

### CHAPTER 74 OF THE TEXAS CIVIL PRACTICE & REMEDIES CODE

A plaintiff who brings a health care liability claim is required to file an expert report that contains "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2009).

When determining whether a report represents a "good faith" effort to comply with the statute, a court's inquiry is limited to the four corners of the report. *Longino v. Crosswhite*, 183 S.W.3d 913, 916 (Tex. App.—Texarkana 2006, no pet.). "A 'good faith' effort requires that the report discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Id.* The expert report is not required to prove the defendant's liability; rather, it need only provide notice of what conduct forms the basis of the plaintiff's complaints. *Id.* The omission of any of the statutory elements prevents the report from being a good faith effort. *Id.* at 917. Further, a report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (stating the expert must explain the basis of his statements to link his conclusions to the facts).

A report must also demonstrate the plaintiff's expert is qualified to render an opinion in the case. *See Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004), pet. denied, 189 S.W.3d 740 (Tex. 2006). Under Chapter 74 of the Texas Civil Practice and Remedies Code, "'[e]xpert' means . . . with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care for a dentist, a dentist or physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(D). Rule 702 of the Texas Rules of Evidence, which governs the admissibility of expert testimony, requires that an expert be qualified by "knowledge, skill, experience, training, or education" and that the testimony "assist the trier of fact." TEX. R. EVID. 702; *see Olveda*, 141

S.W.3d at 681. A person "does not need to be a practitioner in the same speciality as the defendant to qualify as an expert." *Estorque v. Schafer*, No. 2-08-424-CV, 2009 WL 2972892, *4 (Tex. App.—Fort Worth 2009, no pet. h.).

### SUPPLEMENTAL EXPERT REPORT OF DR. NEAL GRAY

The trial court granted the Brandals a 30-day extension to attempt to cure any deficiencies with regard to the initial expert reports filed in connection with their claim against Leland. The Brandals timely served Leland with a supplemental report from their original expert, Dr. Neal Gray, upon receiving the extension from the trial court. Leland challenges Dr. Gray's supplemental report on the ground that it fails to establish he is qualified to render an opinion on causation. Specifically, Leland asserts Dr. Gray's supplemental report "offers nothing new with respect to his specific knowledge, skill, experience, training, or education which would qualify him to provide an expert opinion regarding the proximate cause of Mr. Brandal's stroke." Leland further asserts "Dr. Gray's qualifications remain essentially unchanged in his latest report and are insufficient to establish that he meets the criteria to render an expert opinion as to causation in this matter." We are unpersuaded by Leland's complaint.

Dr. Gray's original report indicates Gray has been licensed to practice medicine since 1966. He completed his anesthesiology residency at Wilford Hall USAF Medical Center in 1972 and received his board certification from the American Board of Anesthesiology in 1974. For the past 17 years, Dr. Gray has been an associate clinical professor of anesthesiology at the University of Texas Health Sciences Center in San Antonio, Texas. Recently, Dr. Gray began working as a staff anesthesiologist at Brooke Army Medical Center where he is responsible for patient care and instructing anesthesia residents. The report further provides as follows:

> [a]nesthesiologists are frequently asked to care for patients similar to Mr. Brandal. In my years of practice of Anesthesiology I have taken part in the care of scores of patients like Mr. Brandal who are at risk for stroke or heart attacks and are taking these medicines. Many of them were having open heart operations with all of the problems of severe disease and bleeding. Thus I have had considerable work experience with these drugs and have great respect for their potency.

This court reviewed Dr. Gray's original report as to his qualifications and concluded it failed to "explain how his knowledge, skill, experience, training, or education qualified him to state that cessation of Plavix and aspirin during the time period in question proximately caused Brandal's ischemic stroke." *Leland*, 217 S.W.3d at 64. We explained:

> Although Dr. Gray states that anesthesiologists are frequently asked to care for patients who are at risk for strokes and who are taking Plavix and aspirin, this does not provide sufficient detail from which the trial court could determine that Dr. Gray's experience sufficiently qualifies him to render an opinion as to proximate cause. Anesthesiologists may administer anesthesia to patients with a myriad of problems but that does not give them specialized knowledge of the causation of such ancillary problems. Further, the fact that Dr. Gray took part in the care of patients like Brandal, does not impart the necessary qualifications to state that the effect of the cessation of Plavix and aspirin during the time period in question proximately caused Brandal's stroke.

*Id.* at 63 (citations omitted).

Dr. Gray's supplemental report provides several pages of additional information relating to his qualifications that were absent from his original report. Dr. Gray's supplemental report details his residency experience, certifications from the American Board of Anesthesiology, and seminar training in the areas of hematology, pharmacology, and physiology. With respect to his seminar training, Dr. Gray states:

> hematological issues like clotting of the blood and pharmacological issues related to anticoagulants and antithrombotic drugs are regularly discussed. Because I am an anesthesiologist, many of the seminars I have attended since entering the practice of medicine have focused specifically on how anticoagulant therapies like Plavix and Aspirin are processed by the body, how they affect the body immediately before, during, and after surgery, and how the body responds when those drugs are

discontinued. Courses on this topic are common at the anesthesiology seminars I attend, especially with the increasing number of Americans who are on chronic anticoagulant therapies like Plavix and Aspirin.

The report further notes Dr. Gray "stay[s] abreast of developments in the field by reading a number of medical journals that involve the field of anesthesiology" and reads "articles describing how anticoagulant therapies like Plavix and Aspirin are processed by the body, how they effect the body immediately before, during, and after surgery, and how the body responds when the drugs are discontinued."

Dr. Gray's supplemental report acknowledges he is a clinical professor of anesthesiology at the University of Texas Health Science Center at San Antonio and a part-time staff anesthesiologist at Brooke Army Medical Center, where he is responsible for teaching residents "about the effects of anticoagulant and antithrombotic therapies of Plavix and Aspirin on blood before, during, and after surgery." The report then states:

> We discuss which patients should stop taking anticoagulant and antithrombotic therapies of Plavix and Aspirin before various types of surgeries, and which surgical procedures are safe to perform while the patient continues anticoagulant and antithrombotic therapies of Plavix and Aspirin. I teach my students how long before various types of surgeries patients need to stop taking these medications, and how to balance the risk of performing the surgery against the risks to the patient of discontinuing the medications.

Dr. Gray's supplemental report also discusses his experiences as a private practitioner. Dr. Gray indicates in his report that during his career as an anesthesiologist, he has "treated numerous patients like George Brandal[,] who are on chronic anticoagulant and antithrombotic therapies of Plavix and Aspirin before, during, and after surgery." Dr. Gray estimates he has served as the anesthesiologist for at least 2,500 open-heart surgery patients over the last 10 years, averaging between 15 and 25 open-heart surgeries per month. According to Dr. Gray, "[a]t least ten percent

(10%) of [his] patients were on anticoagulant and antithrombotic therapies of Plavix and Aspirin." Dr. Gray explains that in his "consultation with these patients, their surgeons, and their primary care physicians, [he has] learned about how Plavix and Aspirin work, and how the body — and specifically the blood — reacts when these drugs are discontinued."

In *Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996), the supreme court considered "whether the trial court abused its discretion in excluding the testimony of an emergency physician that the conduct of the three defendant emergency physicians and the defendant hospital was a cause in fact of a patient's death." *Id.* at 149. The proponents of the expert presented the broad argument that "because [the witness was] a medical doctor," the witness was qualified to testify about "all medical matters in a suit against a medical doctor." *Id.* at 152. The supreme court rejected the proponents argument, noting:

> given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization.

*Id.* The court explained proponents of an expert must "establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153. Given the facts of the case, the court concluded the proponents "simply did not establish that [the witness's] opinions on cause in fact would have risen above mere speculation to offer genuine assistance to the jury." *Id.* at 154.

In this case, however, we believe Dr. Gray's statements in his supplemental report regarding his knowledge, skill, experience, training, and education are sufficient to enable the trial court to conclude he is qualified to offer an opinion on causation. Dr. Gray's statements adequately

demonstrate he is familiar with the specific issue before the trial court — how a patient's blood may be affected when the anticoagulant and antithrombotic therapies of Plavix and aspirin are discontinued in connection with surgery. *See Estorque*, 2009 WL 2972892 at *4 (noting "[t]he proper inquiry in assessing a doctor's qualifications to submit an expert report is not his area of expertise but his familiarity with the issues involved in the claim before the court."). Dr. Gray's supplemental report specifically states he has acquired knowledge about the effects of Plavix and aspirin through practical experience treating patients like Brandal, including "how the body — and specifically the blood — reacts when these [particular] drugs are discontinued." The report further demonstrates Dr. Gray has acquired knowledge, training, and experience regarding the possible effects of Plavix and aspirin on the blood through attending classes focusing "on how anticoagulant therapies like Plavix and Aspirin are processed by the body, how they affect the body immediately before, during, and after surgery, and how the body responds when those drugs are discontinued." Furthermore, the report shows Dr. Gray has acquired knowledge, training, and experience about the specific issue before the court through technical works published in journals, consultations with other physicians, and by teaching medical residents about the risks associated with discontinuing Plavix/aspirin therapy prior to surgery. Because Dr. Gray's supplemental report remedies the deficiencies of his earlier report by demonstrating that he has specific knowledge, skill, experience, training, or education regarding the specific issue before the trial court, we must reject Leland's challenge to Dr. Gray's qualifications.

Leland argues that even if we conclude Dr. Gray is qualified to give an opinion on causation, his supplemental report is nonetheless deficient. Specifically, Leland claims Dr. Gray's opinions are conclusory and do not adequately explain how Leland's alleged negligence caused the stroke

suffered by Brandal. A review of Dr. Gray's supplemental report, however, refutes Leland's assertions.

Dr. Gray's supplemental report explains doctors prescribe aspirin and Plavix to prevent cerebral artery occlusions or strokes. Dr. Gray states both drugs work to inactivate platelets, which are small cells in the blood that clump together to form a lattice where coagulated blood can be held when bleeding occurs. The report describes how "Plavix and Aspirin cause platelets to have less energy in the cells, which prevents them from performing their work and the lattice does not develop." Dr. Gray indicates "[t]he platelets are still there, but just don't do their job . . . Bleeding will be difficult to stop, which is bad, but clots are prevented that might otherwise form inside damaged blood vessels which could cause a stroke or a heart attack." He explains "the clotting and bleeding times of patients taking Plavix and Aspirin begin to return to their normal values as soon as these medications are discontinued," noting "[t]he clotting and bleeding times of patients taking Plavix and Aspirin reach their normal values 5 – 10 days after these medications are stopped." Dr. Gray indicates:

> Platelets live in the blood stream for approximately one week, and the body is constantly producing new platelets. When a new platelet has not been exposed to drugs like Plavix and Aspirin, it does not have the anti-clotting protection that Plavix and Aspirin give. Studies show that the blood regains some of its normal clotting abilities two days or less after cessation of Plavix and Aspirin.[1]

> Aspirin reduces clotting, that is, it has an antithrombotic effect, almost as soon as the patient begins taking it. Aspirin does something else, though, which makes changing or discontinuing this medication very dangerous — Aspirin also increases clotting, but not immediately. Stated differently, when a patient first takes Aspirin, their platelets are less able to clot. When a patient stops taking Aspirin, their platelets become even more "sticky" than they were before, and they clot even more. This is called delayed prothrombotic (causing clotting) effect. In this way, discontinuing

---

[1] Dr. Gray attached some of these studies to his report.

Aspirin can *cause* more blood clots, and more blood clots can cause more strokes. So long as the patient stays on Aspirin, their blood has a diminished ability to clot, and their risk of having a stroke is reduced. As soon as the patient stops taking Aspirin, however, their blood has an increased ability to clot, even more than it did before the patient started taking Aspirin, and the patient's risk of having a stroke increases, potentially even more than their risk before starting an Aspirin therapy.

Dr. Gray's supplemental report next links his knowledge of the medications at issue and the effects of their discontinuation to Brandal's case. The report provides:

There is no indication that Dr. Leland instructed Mr. Brandal to resume taking Plavix and Aspirin immediately after the extraction or that Mr. Brandal did resume taking the medication. Mr. Brandal suffered an ischemic stroke on April 29, 2003, approximately 18 hours after Dr. Leland extracted nine of his teeth. By this time, five days had elapsed since Mr. Brandal had ceased taking his anti-clotting medications . . . [I]t is my opinion that Mr. Brandal's clotting times had returned to their normal value around the time of the surgery and certainly immediately before Mr. Brandal suffered the stroke. This conclusion is supported by the fact that Mr. Brandal's gums stopped bleeding a relatively short time after having nine teeth extracted on April 28, 2003. There are no notations in Dr. Leland's records to indicate that there were any problems controlling bleeding after Mr. Brandal's teeth were removed, which indicates that the platelets in Mr. Brandal's blood had recovered some of their clotting abilities.

Dr. Gray further opines that Brandal had insufficient levels of Plavix and aspirin in his "system to stop his blood from forming the clot that caused him to suffer the ischemic stroke" and concludes, "based upon a reasonable degree of medical certainty, that if Mr. Brandal had been taking his Plavix and Aspirin as prescribed by his treating physician, Mr. Brandal would not have had the stroke within hours of his dental procedure and . . . could be living a meaningful and productive life."

As previously noted, the twofold purpose of an expert report under section 74.351 is to inform the defendant of the specific conduct the plaintiff has called into question and to provide the trial court with a basis to determine whether or not the plaintiff's claims have merit. *Patel v. Williams*, 237 S.W.3d 901, 906 (Tex. App.—Houston [14th Dist.] 2007, no pet.). A review of Dr. Gray's supplemental report demonstrates it contains sufficient information informing Leland of the

specific conduct the Brandals have called into question and how such conduct injured them. Moreover, it provides a basis for the trial court to determine whether or not their claims have merit as it links Leland's breach of the standard of care (instructing Brandal to stop taking his medications) to the Brandals' injury (Brandal's stroke). Keeping in mind that expert reports, such as that of Dr. Gray, are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support, we conclude Dr. Gray's expert report constitutes a good faith effort to comply with the requirements of the statute.

## CONCLUSION

Because Dr. Gray's supplemental report demonstrates his qualifications to opine on the specific issue before the trial court and provides a fair summary of his opinion on the issue of causation, we hold the trial court did not abuse its discretion when it denied Leland's motion to dismiss. The order of the trial court is therefore affirmed.[2]

Catherine Stone, Chief Justice

---

[2] Besides serving Dr. Gray's supplemental report, the Brandals also furnished Leland with a new report prepared by a separate expert, Dr. Mark Ratain. *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (rejecting argument that a deficient report may be cured only by amendment of original expert's report and holding claimant may cure a deficient report by serving new report from a separate expert). Leland does not contest the qualifications of the Brandal's new expert on appeal; rather, Leland claims the new expert's report is deficient as to the issue of causation. Because we have determined Dr. Gray's supplemental report meets the requirements of the statute, we need not address Leland's complaint regarding Dr. Ratain's report. *See Kelly v. Rendon*, 255 S.W.3d 665, 679-80 (Tex. App.—Houston [14 Dist.] 2008, no pet.); *see also* TEX. R. APP. P. 47.1.