**TENET HOSPITALS LIMITED, a Texas Limited Partnership, d/b/a Providence Memorial Hospital, Appellant,**

v.

**Francisco BOADA and Irma Boada, Appellees.**

No. 08–07–00329–CV.

Court of Appeals of Texas, El Paso.

Oct. 21, 2009.

Rehearing Overruled Jan. 27, 2010.

Yvonne K. Puig, Fulbright & Jaworski L.L.P., Austin, TX, for Appellant.

John Grost, El Paso, TX, for Appellees.

Before McCLURE, J., CARR, J., and GOMEZ, Judge.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Tenet Hospitals Limited d/b/a Providence Memorial Hospital (Providence) appeals the denial of its motion to dismiss pursuant to Section 74.351 of the Texas Medical Liability and Insurance Improvement Act. For the following reasons, we affirm in part and reverse in part.

## FACTUAL SUMMARY

On February 5, 2005, Francisco Boada presented at Providence complaining of severe abdominal pain. He was attended by two emergency room physicians and discharged the next morning. He returned to Providence later in the day and underwent surgery for entrapment and death of his small bowel. He suffered the loss of most of his small bowel, short bowel syndrome, persistent fatigue, great weight loss, and profound weakness. Some of these effects are permanent.

On February 1, 2007, the Boadas filed suit against Providence alleging violations of the Emergency Medial Treatment and Active Labor Act (EMTALA). Providence filed an answer raising an affirmative defense that the Boadas' claims were subject to Chapter 74 of the Texas Civil Practice and Remedies Code. The Boadas filed a motion for partial summary judgment asking that Providence's affirmative defense be stricken as their claims were not health care liability claims as defined in Chapter 74.

On April 12, 2007, the Boadas filed an amended petition, joining Dr. Andrea Gonzales and Dr. Randy J. Goldstein as defendants. Negligence claims against the physicians included allegations of (1) failure to timely assess and treat Mr. Boada's severe abdominal pain; (2) failure to make proper tests; (3) failure to take a proper history; (4) failure to perform proper physical examinations; and (5) failure to obtain a proper consultation. The petition asserted the same EMTALA claims against Providence and added negligence allegations that hospital employees, agents, or contractors (1) failed to properly assess Mr. Boada; (2) failed to keep the emergency physician apprised of Mr. Boada's condition; and (3) failed to provide adequate analgesia.

On May 4, 2007, the Boadas served the reports and *curricula vitae* of Edward L. Felix, M.D. and T. Laurence Huffman, M.D. Providence filed objections to both reports and moved for dismissal, arguing that the physicians were not qualified to opine as to causation because neither is licensed to practice medicine in Texas and because their reports did not constitute expert reports as defined by Chapter 74. Providence also challenged Dr. Huffman's report because he was not qualified to opine as to EMTALA violations. The Boadas filed a response.

On July 23, 2007, the Boadas served the report and *curriculum vitae* of Ruthie Robinson, Ph.D., R.N. This report was served more than 120 days after the Boadas filed their original petition. Providence objected to and challenged this report as well. The trial court denied Providence's objections to the reports as well as its motion to dismiss.

## STANDARD OF REVIEW

We review a trial court's decision on a motion to dismiss under Section 74.351 for an abuse of discretion. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001). An abuse of discretion occurs when the trial court acts in an unreasonable or arbitrary manner, without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). A trial court will be deemed to have acted arbitrarily and unreasonably if the trial court could have reached only one decision, yet reached a different one. *See Teixeira v. Hall,* 107 S.W.3d 805, 807 (Tex.App.-Texarkana 2003, no pet.). To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.,* 226 S.W.3d 400, 403 (Tex.2007), *citing In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003). An abuse of discretion does not occur merely because the appellate court may have decided a discretionary matter in a different way than the trial court. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). However, to the extent resolution of the issues presented requires interpretation of the statute, we review the ruling *de novo. See Buck v. Blum,* 130 S.W.3d 285, 290 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

## IS AN EMTALA CLAIM A HEALTH CARE LIABILITY CLAIM?

■ In its first issue, Providence complains that the Boadas' EMTALA claim is a health care liability claim subject to Chapter 74. EMTALA is a federal law enacted in 1986 to prevent "patient dumping"—that is, the practice of refusing to treat patients who are unable to pay. *Marshall v. E. Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 322 (5th Cir.1998). It was not intended to be used as either a federal malpractice statute or a national standard of medical care. *Id.* It serves as a gap filler to provide a remedy for "failure to treat," which is generally not included within state malpractice actions. *Root v. Liberty Emergency Physicians, Inc.,* 68 F.Supp.2d 1086, 1091 (W.D.Mo. 1999), *aff'd,* 209 F.3d 1068 (8th Cir.2000). EMTALA creates a cause of action for individuals who are purportedly harmed either by a participating hospital's failure to (1) provide them with an "appropriate medical screening" to establish if an emergency medial condition exists or (2) to "stabilize" the patient before transfer or discharge if a statutorily defined emergency medical condition has been detected. 42 U.S.C. § 1395dd(a)-(c) (2006). A cause of action may be established in one of two ways. "First, the claimant may establish that the hospital did not meet these requirements because the hospital's screening examination was not appropriate. Second, the claimant may establish that the hospital determined that an emergency medical condition existed and failed to stabilize the condition or transfer the patient to another hospital." *Casey v. Amarillo Hospital District,* 947 S.W.2d 301, 304 (Tex.App.-Amarillo 1997, pet. denied).

■ Medical liability claims are governed by Chapter 74 of the Texas Civil Practice and Remedies Code. Under this chapter, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's

attorney one or more expert reports, with a *curriculum vitae* of each expert listed in the report for each physician or health care provider against whom a liability is asserted. TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(a). A plaintiff cannot recast a health care liability claim in the language of another cause of action to avoid the requirements of the Act. *Gormley v. Stover*, 907 S.W.2d 448, 450 (Tex.1995); *Sorokolit v. Rhodes*, 889 S.W.2d 239, 242 (Tex.1994). We review the underlying nature of the cause of action to determine if the plaintiff has attempted to recast his claim. *Sorokolit*, 889 S.W.2d at 242; *Bush v. Green Oaks Operator, Inc.*, 39 S.W.3d 669, 671 (Tex.App.-Dallas 2001). If the cause of action is based on a breach of the accepted standard of medical care, the cause of action is a health care liability claim. *Gormley*, 907 S.W.2d at 450; *Sorokolit*, 889 S.W.2d at 242.

■■ Generally, when substantive federal claims are raised in state court, state law and procedural rules still govern the manner in which the federal questions are tried and proved. *See Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex.1992) (orig. proceeding); *Mitchell v. Missouri–Kansas–Texas R.R. Co.*, 786 S.W.2d 659, 661 (Tex.1990) (on reh'g); *Dillard Dept. Stores, Inc. v. Owens*, 951 S.W.2d 915, 919 (Tex.App.-Corpus Christi 1997, no writ). EMTALA does not create an exception to this general rule: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). A state statute presents an actual conflict with federal law when compliance with both federal and state regulations is a physical impossibility or where the state law "stands as an obstacle" to the "execution of the full purposes and objec-

tives of Congress." *Hyundai Motor Co. v. Alvarado*, 974 S.W.2d 1, 4 (Tex.1998).

■ In this instance, Chapter 74 does not present an obstacle for any of the Boadas' rights under EMTALA. Compliance with both is possible. *See Johnson v. Nacogdoches Co. Hosp. Dist.*, 109 S.W.3d 532, 536 (Tex.App.-Tyler 2001, pet. denied) (compliance with the Texas Tort Claims Act does not thwart the purposes of EMTALA); *Herman v. St. Paul Medical Center*, No. 05–01–01364–CV, 2002 WL 1060530, at *3 (Tex.App.-Dallas 2002, pet. denied) (not designated for publication) ("anti-dumping" claim is a health care liability claim). We thus agree with Providence that the Boadas are asserting a health care liability claim subject to the procedural provisions of Chapter 74. We sustain Issue One.

## HOW DO EMTALA CLAIMS DIFFER FROM NEGLIGENCE CLAIMS?

■ *Casey* clearly delineates an EMTALA claim from a negligence claim. An EMTALA violation is not to be judged against a negligence standard. *Casey*, 947 S.W.2d at 304. The requirement that the screening examination be "appropriate" requires that hospitals determine what their screening procedures will be and then apply them uniformly to all individuals in the emergency room. *Id.* For the claimant to establish that the hospital's screening procedures are not appropriate, the claimant must establish that he did not receive the same screening examination as every other person who enters the emergency room with the same or similar condition. *Id.* If a hospital provides an appropriate medical screening examination, it is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis that could subject him and his employer to liability in a medical malpractice action brought under state law. *Mar-*

*shall,* 134 F.3d at 322. Thus, a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as a subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening. *Id.* at 323, *citing Summers v. Baptist Med. Center Arkadelphia,* 91 F.3d 1132, 1138–39 (8th Cir.1996) (en banc) ("'faulty' screening . . . does not come within EMTALA") and *Vickers v. Nash General Hosp., Inc.,* 78 F.3d 139, 143–44 (4th Cir.1996) (EMTALA "does not impose any duty on a hospital requiring that the screening result in a correct diagnosis"). A screening that is "'so cursory' that it is 'not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury' violates EMTALA, . . . [b]ut an emergency room physician is only 'required by EMTALA to screen and treat the patient for those conditions the physician perceives the patient to have.'" *Guzman v. Memorial Hermann Hospital System,* 637 F.Supp.2d 464, 483 (S.D.Tx.2009), *citing Bryant v. Adventist Health System/West,* 289 F.3d 1162, 1166 n. 3 (9th Cir.2002) and *Hunt v. Lincoln Cty. Memorial Hosp.,* 317 F.3d 891, 893 (8th Cir.2003).

■■■■ If there is no showing that the screening examination is not appropriate, a claim can still be made upon a showing that the hospital, after determining that an emergency medical condition existed, failed to either stabilize the medical condition or transfer the patient to another medical facility. *Casey,* 947 S.W.2d at 304. This means the claimant must show that the emergency medical condition was within the actual knowledge of the doctors on duty. *Id.* The hospital's actions are to be viewed in terms of the actual diagnosis, not in terms of what the diagnosis should have

been. In other words, EMTALA requires that the hospital have actual knowledge of an emergency condition, not that the hospital negligently failed to diagnose a condition as being an emergency condition. *Id.* at 306.

■■■■ An emergency medical condition is a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or the child) in serious jeopardy, (ii) serious impairment of bodily functions, or (iii) serious dysfunction of any bodily organ or part. 42 U.S.C. § 1395dd(e)(1). An emergency medical condition exists only if a patient is in "imminent" danger of death or a worsening condition which could be life-threatening. *Watts v. Hermann Hosp.,* 962 S.W.2d 102, 104–105 (Tex.App.-Houston [1st Dist.] 1997, no pet.), *citing Delaney v. Cade,* 986 F.2d 387, 392 (10th Cir.1993); *Tolton v. American Biodyne, Inc.,* 854 F.Supp. 505, 511 (N.D.Ohio 1993), *aff'd,* 48 F.3d 937 (6th Cir.1995).

With regard to damages, 42 U.S.C. § 1395dd(d)(2)(A) specifically states:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

Additionally, 42 U.S.C. § 1395dd(d)(1)(A) provides that "[a] participating hospital that negligently violates a requirement of this section is subject to a civil money penalty of not more than $50,000 (or not more than $25,000 in the case of a hospital

with less than 100 beds) for each such violation."

## MUST THE EXPERTS BE LICENSED IN TEXAS?

 In Issue Two, Providence challenges the qualifications of the expert physicians because neither is licensed to practice medicine in Texas. TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(a). The crux of the argument is that a physician licensed in another state may opine as to the applicable standard of care and any breaches thereof, but only a physician licensed in Texas may opine as to causation. Our analysis of this issue requires an interpretation of the interplay between various provisions of Chapter 74. In Subchapter A, entitled "General Provisions," the definition statute provides in pertinent part:

(a) In this chapter:

. . .

(23) "Physician" means:

(A) an individual licensed to practice medicine in this state;

(B) a professional association organized under the Texas Professional Association Act (Article 1528f, Vernon's Texas Civil Statutes) by an individual physician or group of physicians;

(C) a partnership or limited liability partnership formed by a group of physicians;

(D) a nonprofit health corporation certified under Section 162.001, Occupations Code; or

(E) a company formed by a group of physicians under the Texas Limited Liability Company Act (Article 1528n, Vernon's Texas Civil Statutes).

TEX.CIV.PRAC. & REM.CODE ANN. § 74.001(a)(23)(A-E). "Expert" is defined in Subchapter H, which is entitled "Procedural Provisions."

(5) "Expert" means:

(A) with respect to a person giving opinion testimony regarding whether a physician departed from accepted standards of medical care, an expert qualified to testify under the requirements of Section 74.401;

(B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;

(C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence;

TEX.CIV.PRAC. & REM.CODE ANN. § 74.351(r)(5)(A)-(C). We turn then to Subchapter I, entitled "Expert Witnesses":

(g) In this subchapter, "physician" means a person who is:

(1) licensed to practice medicine in one or more states in the United States; or

(2) a graduate of a medical school accredited by the Liaison Committee on Medical Education or the American Osteopathic Association only if testifying as a defendant and that testimony relates to that defendant's standard of care, between the alleged departure from that standard of care and the injury, harm, or damages claimed.

TEX.CIV.PRAC. & REM.CODE ANN. § 74.401(g)(1). Section 74.403 governs the qualifications of expert witnesses on causation in a health care liability claim. It provides in pertinent part:

(a) Except as provided by Subsections (b) and (c), in a suit involving a health care liability claim against a physician or

health care provider, a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence. Tex.Civ.Prac. & Rem.Code Ann. § 74.403(a).

Providence maintains that a physician authoring a health care liability report must be licensed in the State of Texas because Subchapter A—which defines a physician as being someone licensed in this state—applies to Chapter 74 as a whole. Subchapter H governs the chapter's procedural provisions including the expert report provision outlined in Section 74.351. Providence argues that each subchapter has a distinct application to a medical liability case, and that Subchapter H is limited to the procedural requirements, such as the timely filing of an expert report, and the requisite contents of the report. In support of this argument, Providence points to Tex.Civ.Prac. & Rem.Code Ann. § 74.351(k), contained within Subchapter H, which states that the expert report is not admissible in evidence, and shall not be used in a deposition, trial, or other proceeding, and cannot be referred to by any party during the course of the action for any purpose. On the other hand, Subchapter I, entitled "Expert Witnesses," does not mention expert reports or those who author them. While Subchapter I gives the standards for qualifications of testifying experts in the case-in-chief, Subchapter H clearly governs expert reports. Providence reasons that as the term "physician" is not defined within Subchapter H, the definition provided in the general provisions of Subchapter A must apply.

Providence also argues that in Subchapter I, the Legislature provided the standards for a witness to qualify as an expert in the context of testifying in the actual case, and that the differing structures between Subchapter H and Subchapter I are not duplicative. The scope of Subchapter H is limited to expert reports which are solely a concern for plaintiffs. On the other hand, Subchapter I applies to expert testimony offered by both plaintiffs and defendants once the plaintiff has met the thresholds requirements of an expert report under the auspices of Subchapter H. Providence notes that the prefatory language in Section 74.001(a) begins, "In this chapter" and then provides a list of terms and their meanings for all of Chapter 74. While Section 74.401(g) begins, "In this subchapter, 'physician' means a person who is licensed to practice medicine in one or more states in the United States." Providence reasons that this more expansive definition of physician applies only to Subchapter I.

Providence continues that Section 74.351(r)(5)(A) provides that an expert opining on whether a physician departed from the accepted standards of medical care must meet the requirements of Section 74.401. Also, Section 74.351(r)(5)(B) indicates that an expert who is to opine on whether a health care provider deviated from the accepted standards of care must meet the requirements of Section 74.402. But an expert who is to opine on causation is not referenced to Section 74.403 which governs the qualifications of an expert witness regarding causation. Citing *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 496–97 (Tex.2001) and other authority, Providence argues we must presume that every word in a statute is included purposefully.

The Boadas respond that Section 74.401(g) of Subchapter I provides the applicable definition of a physician who can write a report required under Section 74.351. As it states that "physician"

means a person who is licensed to practice in one or more states in the United States, the reports at issue fulfill the requirements of Subchapter H. The Boadas also argue that the definition of "physician" found in Subchapter A, Section 74.001(a)(23)(A-E), is inapplicable because not only does it define a physician as an individual who is licensed to practice medicine in Texas, it also defines professional associations, partnership entities, nonprofit health corporations and other business entities as being physicians. They postulate that the real purpose of Section 74.001(a)(23)(A-E) is to identify potential defendants—both natural beings and various non-natural entities. We agree.

The Amarillo Court of Appeals has come to the same conclusion. In *Springer v. Johnson*, 280 S.W.3d 322 (Tex.App.-Amarillo 2008, no pet.), the court held that a physician need not be licensed to practice medicine in Texas to be qualified to provide expert opinion on causation in an expert report. The court looked to *Lee v. Mitchell*, 23 S.W.3d 209 (Tex.App.-Dallas 2000, pet. denied), holding that the legislative history of former statute 4590i indicated a physician making an expert report was not required to be a physician licensed in Texas. *Springer*, 280 S.W.3d at 328.[1] *See* former Article 4590i at § 13.01(r)(5)(A). The *Springer* court specifically rejected the claim that by its own language Section 74.001(a)(23) applies to the entire chapter while the language contained in Section 74.401(g) applies only to that subchapter.[2]

[T]he general definition of a "physician" applicable to Chapter 74 as a whole must yield in § 74.351(r)(5)(C) to the special definition of "physician" in § 74.401(g) specifically drafted to apply to expert witnesses for applicable standard(s) of care and causation. A specific statute such as the physician-expert definition in § 74.401(g) more clearly evinces the intention of the Legislature on expert witness qualification than the general definition of "physician" in § 74.001(a)(23). *See* 67 Tex. Jur.3d *Statutes* § 123 (2003). This is particularly so where the Legislature has chosen to use the identical language or phrasing to describe expert witness qualification for causation issues as a physician who is "otherwise qualified to render opinions" on causal relationships under the Texas Rules of Evidence in *both* statutes, § 74.351(r)(5)(C) and § 74.403(a). "When construing a statutory word or phrase, a court may take into consideration the meaning of the same or similar language used elsewhere in the act." *Guthery v. Taylor*, 112 S.W.3d 715, 721 (Tex.App.-Houston [14th Dist.] 2003, no pet.).

*Springer*, 280 S.W.3d at 329–30. The court also rejected the significance of the omission of a citation to Section 74.403 following the definition of a causation expert in Section 74.351(r)(5)(C). *Id.* at 330

---

1. In 2003, the Legislature repealed Article 4590i, effective September 1, 2003, and replaced it with Chapter 74 of the Civil Practices and Remedies Code. *See* Acts of 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2039–2053, amended by Acts of 1993, 73rd Leg., R.S., ch. 625, § 3, 1993 Tex. Gen. Laws 2347, 2347–49, amended by Acts of 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 985–989 (former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 1.01–16.02, the "Medical Liability and Insurance Improvement Act"), repealed by Acts of 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (current version at Tex.Civ.Prac. & Rem.Code Ann. § 74.001 et seq. (Vernon 2005) (eff. Sept. 1, 2003).

2. We note that the *Springer* court mistakenly used the word "section" as opposed to the word "subchapter" contained in Section 74.401(g). 280 S.W.3d at 329.

("That 'expert' qualifications for drafting a report regarding the standard of medical care for claims against a physician or a health care provider are followed by citations to Subchapter I while qualifications for an "expert" on causation are not, is of no moment."). We agree a general provision must yield to a succeeding specific provision dealing with the same subject matter. *Springer*, 280 S.W.3d at 329. For these reasons, we overrule Issue Two.

## IS THE REPORT BY DR. FELIX AN EXPERT REPORT AS TO PROVIDENCE?

 In Issue Three, Providence contends that if Dr. Felix is qualified, his report is not an expert report as to Providence. The Supreme Court has determined that the omission of statutory elements of a plaintiff's claims as to a particular defendant—including how the defendant breached the standard of care and the causal nexus between the breach and the damages—does not constitute a good faith effort to meet the statutory requirements. *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex.2006). We agree with Providence that Dr. Felix's report alleges no misconduct by Providence, much less discusses the elements with sufficient specificity to inform the hospital of the conduct the Boadas call into question. *Id.; American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex.2001).

Dr. Felix is a board certified general surgeon specializing in surgical treatment of obesity. He is the medical director of the Advanced Bariatric Centers of California, Inc. In his report, he faults the conduct of both emergency physicians, although he identifies only Dr. Gonzalez by name. Providence is mentioned only as follows:

Mr. Boada had undergone bariatric surgery in early July, 2005 [3] [sic] at Providence Memorial Hospital, El Paso, Texas.

. . .

On February 5, 2005, Mr. Boada, 35 years old, sought care at Providence Memorial Hospital for severe abdominal pain that started two hours before he signed in to the ED.

. . .

This standard was not met by either of the emergency physicians caring for Mr. Boada in Providence's ED on February 5th and 6th, 2005.

. . .

If Mr. Boada's surgeon or the covering surgeon had been consulted prior to Mr. Boada's discharge from Providence Memorial Hospital, it is more likely than not that he would have been taken to the operating room for an exploratory laparoscopy or possibly a laparotomy in the morning of February 6, 2005 as this was and is the standard of care. Instead Mr. Boada was inappropriately discharged and returned to Providence Memorial Hospital late in the evening of the 6th.

The report does not state a standard of care for Providence, a breach of the standard of care, or causation as to that medical care provider. At best, it infers that the emergency room physicians "inappropriately discharged" Mr. Boada. Dr. Felix does not specify EMTALA, nor can his description of breaches of the standard of care by the emergency room physicians implicate EMTALA. A private cause of action under EMTALA is only available against hospitals, not against individual physicians. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256–57 (9th Cir.1995);

---

**3.** The by-pass surgery was performed in 2003.

*King v. Ahrens,* 16 F.3d 265, 271 (8th Cir.1994); *Delaney v. Cade,* 986 F.2d 387, 393–94 (10th Cir.1993); *Baber v. Hospital Corp. of America,* 977 F.2d 872, 877–878 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1040 n. 1 (D.C.Cir.1991)(dicta). Because the report does not constitute an expert report as to Providence, we sustain Issue Three. Our disposition of this issue renders it unnecessary that we consider Issue Five.

## DR. HUFFMAN'S REPORT

Providence urges four separate complaints with regard to Dr. Huffman's report: (1) Dr. Huffman's report does not constitute an expert report as to Providence; (2) his report is inadequate because it omits the required statutory elements; (3) he is not qualified to opine on EMTA-LA; and (4) his opinions on EMTALA do not meet the standards of Chapter 74.

### Contents of the Report

Dr. T. Laurence Huffman is board certified in family practice, geriatrics, and emergency medicine. His report is lengthy and mentions Providence in the following particulars:

> Mr. Boada sought care at Providence Memorial Hospital due to severe abdominal pain caused by strangulation of his small bowel. Although Mr. Boada remained in severe pain the entire time he was in Providence's ED, he was discharged.

> . . .

> In my opinion the discharge of Mr. Boada at 6:50 a.m. while he was in severe pain and while a reasonable diagnosis had not been established was a deviation of the applicable standards of care for such a patient and violation of EMTA-LA.

> . . .

> From my review of Mr. Boada's medical records he returned to Providence's ED the same day he had been sent home and was admitted to the hospital for ischemia of the small bowel due to strangulation and entrapment in an internal hernia. It is apparent from the records that Providence Memorial Hospital had the capability to perform abdominal CT scans and that a general surgeon was available for consultation in the emergency department. Thus, Mr. Boada did not receive a medical screening examination within the capability of the hospital. This was a violation of EMTA-LA. In addition, he was discharged in severe pain, also a violation of EMTA-LA. He was discharged in an unstable condition, an EMTALA violation. He was discharged without an adequate plan for appropriate care given his medical condition, another violation of EM-TALLA [sic]. Finally, the fact that he was discharged at all is a violation of EMTALLA [sic].

> . . .

> In summary, Providence Memorial hospital violated EMTALA by:
> A. Not providing Mr. Boada with an appropriate medical screening that would have included:
> 1. A complete history.
> 2. A thorough physical examination and serial abdominal examinations.
> 3. A repeat white blood count.
> 4. A CT Scan of the abdomen.
> 5. A surgical consultation.
> B. Discharging Mr. Boada while he was still in significant, unrelieved pain.

It is clear from our reading of the report that Dr. Huffman was offering an opinion that implicated wrongful conduct by Providence. We overrule Issue Four.

### Is the Report Inadequate?

In Issue Six, Providence complains that Dr. Huffman's report is inade-

quate because it omits the statutory elements of a Section 74.351 expert report. We agree in part. Subsection (r)(6) provides that the report must include a fair summary of the expert's opinions concerning (1) applicable standards of care; (2) the manner in which the care rendered by the physician or health care provider failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV.PRAC. & REM.CODE ANN. § 74.351(r)(6). We have held that where a report totally omits one of the three required elements, the trial court has a ministerial duty to dismiss the lawsuit with prejudice and has no discretion to do otherwise. *In re Tenet Hosps., Ltd.,* 116 S.W.3d 821, 827 (Tex. App.-El Paso 2003, orig. proceeding).

By its own terms, Dr. Huffman's report identifies breaches in the standard of care in terms of EMTALA only. While he makes reference to the nursing notes, he mentions them only to document that Mr. Boada complained of intense and increasing pain which should have prompted the physicians to obtain a CT scan, to conduct a physical re-evaluation, to consult with a general surgeon, and to admit him for appropriate hydration and pain control. With regard to hospital negligence, it fails to identify any of the three elements. The report is wholly inadequate to support the Boadas' negligence claims. To that extent, we sustain Issue Six.

### Is Dr. Huffman Qualified to Opine on EMTALA?

 Citing *Broders v. Heise,* 924 S.W.2d 148, 153 (Tex.1996), Providence contends that simply practicing medicine is insufficient to qualify a physician as an expert on EMTALA standards. It argues that Dr. Huffman's *curriculum vitae* must reveal expertise with and knowledge of the EMTALA standards. *Broders,* of course, did not address EMTALA. In fact, we have found no case specifically addressing the issue,[4] and Providence directs us to none. While Dr. Huffman does not include specific information as to his knowledge of EMTALA and his expertise in identifying violations, he does detail some thirty years of experience in the practice of emergency medicine, including positions as the medical director of hospital emergency departments. In addition to his medical degree, Dr. Huffman has a master's degree in health administration. We conclude that he meets the statutory criteria of board certification and actively practicing health care in rendering health care services relevant to the alleged EMTALA violations. Issue Seven is overruled.

### Do Dr. Huffman's Opinions on EMTALA Meet Chapter 74 Standards?

Providence next complains that Dr. Huffman's report must provide a fair summary regarding the applicable standards of care required by EMTALA. It contends that the report is fatally defective because it does not compare Mr. Boada's medical screening with that of any other emergency room patients in a similar condition and because it is based in hindsight on the premise that Mr. Boada had an emergency medical condition but was discharged in an unstable condition. In con-

4. In *Philipp v. McCreedy,* 298 S.W.3d 682 (Tex.App.-San Antonio 2009, no pet.), the plaintiff sued the emergency physician, his physician's assistant, and the hospital alleging negligence and EMTALA violations. Via footnote, the court explained that no challenge had been made to the expert report regarding the allegations of the EMTALA violations. *Id.,* at 690–91 n. 1.

nection with these arguments, Providence cites us to *Camp v. Harris Methodist Fort Worth Hosp.*, 983 S.W.2d 876 (Tex.App.-Fort Worth 1998, no pet.), *Watts v. Hermann Hosp.*, 962 S.W.2d 102 (Tex.App.-Houston [1st Dist.] 1997, no pet.), and *C.M. v. Tomball Reg'l Hosp.*, 961 S.W.2d 236 (Tex.App.-Houston [1st Dist.] 1997, no writ). *Camp* involved an appeal from a jury trial while both *Watts* and *C.M.* involved appeals from summary judgment.

■■■■■ The expert report requirement is designed to promptly identify frivolous lawsuits while preserving meritorious claims. *Constancio v. Bray*, 266 S.W.3d 149, 163 (Tex.App.-Austin 2008, no pet.) (Patterson, J., dissenting). The report need only fulfill two purposes (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Philipp*, 298 S.W.3d at 685–86. We do not necessarily disagree with Providence's articulation of EMTALA's requirements, but we conclude that the report is not inadequate. Whether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74. *Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 199–200 (Tex.App.-Houston [14th Dist.] 2009, no pet. h.), *citing Sanjar v. Turner*, 252 S.W.3d, 460, 467 n. 6 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (concluding that doctor's arguments that he did not owe duty to patient as described in expert report was an issue for summary judgment rather than a motion to dismiss) *and Wissa v. Voosen*, 243 S.W.3d 165, 169–70 (Tex.App.-San Antonio 2007, pet. denied) (same). We will not speculate on the outcome of any summary judgment proceedings. Issue Eight is overruled.

## WAS NURSE ROBINSON'S REPORT UNTIMELY?

Finally, Providence argues that the Boadas failed to timely serve Ruthie Robinson's report within 120 days of filing health care liability claims against Providence. Suit was filed on February 1, 2007. Within the 120–day window, the Boadas served the Felix and Huffman reports. Nurse Robinson's report was not served until July 23, 2007.

The Boadas respond that the only cause of action asserted against Providence in the original petition was the EMTALA claim. The petition was amended on April 12, 2007 to include negligence claims. They conclude that the 120–day time period began to run from the date the amended petition was filed such that Nurse Robinson's report was timely.

### Which Statute Applies?

Providence relies upon Section 74.351(a):
(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date **the original petition was filed,** serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

Tex.Civ.Prac. & Rem.Code Ann. § 74.351(a) (emphasis added). This provision was enacted by the Legislature in 2005. *See* Acts 2005, 79th Leg., ch. 635, § 1, 2005 Tex.

Gen. Laws 1590, eff. Sept. 1, 2005. But Section 2 provides:

> This Act applies only to a cause of action that accrues on or after the effective date of this Act. An action that accrued before the effective date of this Act is governed by the law applicable to the action immediately before the effective date of this Act, and that law is continued in effect for that purpose. *See* Acts 2005, 79th Leg., ch. 635, § 2, 2005 Tex. Gen. Laws 1590.

Mr. Boada's claim accrued on February 5, 2005. Consequently, we look to the prior statute:

> (a) In a health care liability claim, a claimant shall, not later than the 120th day after the date **the claim was filed,** serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.

We thus agree with the Boadas that Nurse Robinson's report was filed within 120 days of the date the negligence claim was asserted. We overrule Issue Nine.

## CONCLUSION

▇▇▇ We conclude that the trial court erred in denying the objections to the adequacy of Dr. Felix's report. We similarly conclude that the court erred in denying the objections to the adequacy of Dr. Huffman's report with regard to the negligence claims. Although Nurse Robinson's report was timely and properly articulated the nursing standards of care and breaches thereof, she is not qualified to opine as to causation. TEX.CIV.PRAC & REM. CODE ANN. § 74.351(r)(5)(C); *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 248 (Tex.App.-San Antonio 2004, no pet) (a registered nurse is not qualified to express expert opinion as to causation). Because the Boadas have failed to present an expert opinion as to causation, their negligence claims must fail. *Palacios,* 46 S.W.3d at 879 (a report does not constitute a good faith effort if it omits any of the statutory requirements). We thus reverse the trial court's order denying Providence's motion to dismiss the negligence case.

However, we conclude that Dr. Huffman's report is adequate to support the Boadas' EMTALA claims. Consequently, we affirm the trial court's order that denies Providence's objection to that report and denies the motion to dismiss sought on that basis.

We echo the sentiments of Chief Justice Stone in *Philipp:*

> The trial court acknowledged the ongoing difficulty arising from the requirements of Chapter 74, specifically noting on the record that litigants and attorneys need guidance. In fact, the trial court expressed frustration that the trial courts are merely pawns in the "little game" of expert report litigation. There is no doubt that Chapter 74 has spawned a cottage industry of expert report litigation....

*Philipp,* 298 S.W.3d at 684. We fault neither party nor the vigorous representation of their counsel. We simply note that these hearings are inherently fact-based and trial courts must pick and choose from a menu of appellate decisions that parse every word of an expert report. We understand the frustration.

CARR, J., not participating.

GOMEZ, Judge, sitting by assignment.