

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00136-CV

Gerald **HARRINGTON**, M.D.,
Appellant

v.

Sandra **SCHROEDER** and Duane J. Ramos, Individually and as All Heirs to the Estate of
Sylvia Ramos, Deceased,
Appellees

From the 288th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-CI-06284
Honorable John D. Gabriel, Jr., Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:       Karen Angelini, Justice
               Rebeca C. Martinez, Justice
               Jason Pulliam, Justice

Delivered and Filed:  December 16, 2015

AFFIRMED

Gerald Harrington, M.D. appeals an order denying his motion to dismiss the healthcare liability lawsuit filed against him by Sandra Schroeder and Duane J. Ramos, individually and as all heirs to the estate of Sylvia Ramos, deceased.  We affirm the judgment of the trial court.

### BACKGROUND

Sylvia Ramos was a resident of Trisun Care Center Windcrest when she died as a result of an assault by a fellow nursing home resident; her death was ruled a homicide.  Appellees sued the following for negligence: Trisun Care Center; Setters Medical Group, P.A.; Rudolfo Zarate, M.D.;

Zarate Medical Group, P.A.; and Dr. Harrington. Pursuant to Section 74.351, appellees filed the expert report of Loren G. Lipson, M.D. According to this report, Dr. Harrington was negligent in failing to: (1) provide appropriate input as to Ms. Ramos's care plan; (2) perform timely and adequate assessments of Ms. Ramos; (3) document Ms. Ramos's medical care accurately; and (4) coordinate discharge of Ms. Ramos to another facility that could meet her needs.

Dr. Harrington filed objections to the expert report filed by appellees. Dr. Harrington objected to Dr. Lipson's report on the basis that it fails to (1) establish that Dr. Lipson is competent to testify as an expert witness and (2) adequately identify and explain any causal link between the alleged breaches of the standard of care by Dr. Harrington and Ms. Ramos's injuries and damages. Dr. Harrington subsequently filed a motion to dismiss pursuant to section 74.351, arguing that Dr. Lipson's report failed to meet all the requirements of section 74.351. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West Supp. 2015).

After holding a hearing on the motion to dismiss, the trial court denied Dr. Harrington's motion to dismiss, and he appealed. On appeal, Dr. Harrington seeks a reversal of the trial court's order denying the motion to dismiss, and a remand to the trial court for a determination of statutory attorney's fees.

### STANDARD OF REVIEW

We review a trial court's ruling on the sufficiency of an expert's report for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015); *Rosemond v. Al–Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). A trial court abuses its discretion if it rules without reference to guiding rules or principles. *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011). "When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute

its own judgment for the trial court's judgment." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex. 1989)).

## DISCUSSION

Section 74.351(a) of the Texas Civil Practice and Remedies Code mandates that in a "health care liability claim," a claimant must serve on each party or his attorney one or more expert reports. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). If a claimant fails to serve the required report, the trial court must—upon the motion of the affected physician or health care provider—dismiss the claim with prejudice and award attorney's fees and costs. *Id.* § 74.351(b) (West Supp. 2015).

When presented with a motion to dismiss a healthcare liability claim, the trial court must determine whether the expert report represents a good faith effort to comply with the statutory definition of an expert report. *See Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West Supp. 2015). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2015).

In evaluating an expert report, the trial court looks only to the information within the four corners of the report and is prohibited from making any inferences. *Wright*, 79 S.W.3d at 52-53; *Palacios*, 46 S.W.3d at 878. Although the expert report need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the three elements identified in the statute: standard of care, breach, and causal relationship. *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. The expert cannot merely state his conclusions about these elements in his report. *Wright*, 79

S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. The expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010); *Wright*, 79 S.W.3d at 52 (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). To constitute a good-faith effort to comply with the statutory definition, the expert's report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. "A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes." *Id.*; *Jelinek*, 328 S.W.3d at 539.

On appeal, Dr. Harrington argues the trial court abused its discretion in denying his motion to dismiss because Dr. Lipson's report is deficient in that it fails to (1) establish that Dr. Lipson is competent to testify as an expert witness and (2) set forth the causal relationship between Dr. Harrington's alleged breaches of the standard of care and the alleged injuries suffered by Ms. Ramos.

### *Service of Defendant's Objections to Expert Report*

At the outset, we must address appellees' contention that Dr. Harrington waived his objections to Dr. Lipson's expert report by failing to serve said objections on counsel for appellees within 21 days of receipt of the expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). At the hearing on the motion to dismiss, appellees argued that although Dr. Harrington's objections were timely filed, they were not served on plaintiffs' attorneys until four months after the deadline to do so had passed. *See* TEX. R. CIV. P. 21a. After much discussion over whether electronic service was properly effected, and after the court contemplated resetting the hearing to permit evidence to be presented by the service provider for Dr. Harrington's counsel, plaintiffs' counsel informed the court as follows:

> Judge, I have no problem going forward on the substance of the Chapter 74 report. I feel that we would win on the service issue; however, I feel that the Chapter 74 report is more inadequate [sic] for what the rules require. So I'm prepared to talk about that, if you would like.

After reviewing the record, we conclude that appellees have waived consideration of this issue. *See* TEX. R. APP. P. 33.1(a). At the hearing on the motion to dismiss, the trial court indicated it would reset the hearing to consider evidence regarding the electronic service. At that time, counsel for appellees abandoned the objection and affirmatively informed the trial court that he had "no problem going forward on the substance of the Chapter 74 report." The parties then proceeded to discuss the substance of Dr. Harrington's motion to dismiss, including his complaints related to Dr. Lipson's qualifications and his statements regarding causation, without any further mention of the service issue. Accordingly, appellees have failed to preserve any complaint related to service of the objections.

*Qualifications*

Dr. Harrington contends Dr. Lipson's report is deficient because it fails to establish that Dr. Lipson is competent to testify as an expert witness. As to Dr. Lipson's standard of care opinions, he maintains that there is no affirmative showing that Dr. Lipson was board certified and was actively practicing medicine in rendering medical care relevant to the claim against Dr. Harrington at the time the claim arose or at the time the report was authored. As to Dr. Lipson's causation opinions, he maintains Dr. Lipson is not qualified to testify because he is not licensed to practice medicine in Texas.

An expert must establish that he is qualified to provide an acceptable report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(B) (West Supp. 2015). Qualifications of an expert must appear in the expert report and curriculum vitae and cannot be inferred. *See Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied). Analysis of the expert's

qualifications under section 74.351 is limited to the four corners of the expert report and the expert's curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) (orig. proceeding).

### A) *Qualifications to Render Standard of Care Opinions*

To be qualified to provide opinion testimony regarding whether a physician departed from the accepted standard of medical care, the expert must satisfy section 74.401. *See* TEX. CIV. PRAC. & REM. CODE §§ 74.351(r)(5)(A), 74.401(a) (West Supp. 2015 & West 2011). Under section 74.401, the expert must be a physician who: (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *Id*. § 74.401(a). "Practicing medicine" includes, but is not limited to, "training residents or students at an accredited school of medicine or osteopathy." *Id*. § 74.401(b) (West 2011). "In determining whether a witness is qualified on the basis of training or experience" to offer an expert opinion regarding the applicable standards of medical care, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id*. § 74.401(c) (West 2011); *Bailey v. Amaya Clinic, Inc*., 402 S.W.3d 355, 362-63 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

In his report, Dr. Lipson states:

> During the course of my career, I have been Board Certified in Internal Medicine, Geriatric Medicine, and Utilization Review and Quality Assurance. I have served as Director of the University of California ('USC') Teaching Nursing Home

Program and Co-Director of the Los Angeles County USC Medical Center Adult Protection Team-Geriatric Assessment Clinic. I have worked with the Keck School of Medicine at USC for over 29 years, having served as the Chief of the Section of Geriatric Medicine and Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupation Science and Occupational Therapy. I am currently Professor Emeritus of Medicine. I also currently serve as Co-Director in Geriatric Education and as Affiliate Professor at the University of Alaska, Anchorage in the College of Health and in the WWAMI Program for Alaskan Medical Students. I am also Adjunct Professor at the School of Community and Global Health, Claremont Graduate University.

Additionally, I am a consultant to the Department of Justice, State of California and New Mexico, and U.S. Department of Justice in areas of geriatric care and elder abuse. I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.

I have extensive personal experience in primary medical care as well as in subspecialty consultation and long-term care. In addition to my academic teaching, research, and administrative responsibilities, I am currently practicing medicine and was doing so at the time the claims described below occurred.

As a result of my education, training, and experience, I am qualified to render a relevant and reliable expert opinion on the standard of care applicable to the treating physician, Dr. Harrington…Through my extensive personal experience in primary medical care and the various positions I have occupied during the course of my career, I am familiar with the accepted standards of medical care applicable to treating physicians at nursing home facilities.

Dr. Harrington argues that there is no affirmative showing that Dr. Lipson was board certified and was actively practicing medicine or rendering medical care relevant to the claim against Dr. Harrington at the time the claim arose or at the time the report was authored, and thus Dr. Lipson is not qualified to testify as to the standard of care. We disagree. Board certification is just one of the considerations the trial court may evaluate when determining whether an expert qualifies as an expert on the issue of whether the defendant departed from accepted standards of medical care. *Id*. § 74.401(c)(1). The trial court may also consider the physician's training or experience in the area of medical practice relevant to the claim. *Id*. Even though Dr. Lipson's board certifications may have lapsed, his training and experience make him sufficiently qualified

in this case. According to the expert report, Dr. Lipson has extensive experience in the areas of geriatric medicine and long term care; he is also the author of several articles relating to those subjects. His resume reflects post-graduate training in the area of geriatrics and care of the elderly. Dr. Lipson's experience in geriatric medicine, as set forth in his 47-page curriculum vitae, is significant and he continues to be on staff at the University of Alaska, Anchorage and at the School of Community and Global Health, Claremont Graduate University. In addition, he is Professor Emeritus of Medicine at the University of Southern California. He also currently serves as a consultant to various governing bodies in the areas of geriatric care and elder abuse. Accordingly, the fact that Dr. Lipson's board certifications have lapsed does not alone render him unqualified as an expert in this case.

Dr. Harrington similarly complains that the report does not reflect that Dr. Lipson is actively practicing medicine. However, Dr. Lipson affirmatively states in the report that, "I am currently practicing medicine and was doing so at the time the claims described below occurred," and the report demonstrates that, as the Co-Director in Geriatric Education at the University of Alaska, Anchorage, Dr. Lipson trains students at an accredited school of medicine. *See id*. § 74.401(b) ("practicing medicine" includes, but is not limited to, "training residents or students at an accredited school of medicine or osteopathy"). As a consequence, the statement in his report that he is familiar with the accepted standards of medical care applicable to treating physicians at nursing home facilities is supported by his curriculum vitae and report. Given his experience in the field of geriatrics and long-term care, Dr. Lipson has the requisite skill and knowledge to opine that Dr. Harrington had a duty to assist Trisun in providing input into Ms. Ramos's care plan, to perform timely and adequate assessments of Ms. Ramos, and to coordinate discharge of Ms. Ramos to a facility that could meet her health needs. We, therefore, conclude that the trial court did not abuse its discretion in finding Dr. Lipson sufficiently qualified, as set forth in his report

and curriculum vitae, to opine on the accepted standards of medical care applicable to Dr. Harrington. *See id.* § 74.401(c); *PM Mgmt.-Wurzbach NC, LLC v. Jones*, No. 04-09-00506-CV, 2010 WL 374406, at *2 (Tex. App.—San Antonio Feb. 3, 2010, no pet.) (mem. op.).

### B) Qualifications to Render Causation Opinions

A person is qualified to give opinion testimony concerning the causal relationship between the alleged injury and the alleged departure from the applicable standard of care only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(C), 74.403(a) (West Supp. 2015 & West 2011). Dr. Harrington argues that Dr. Lipson is not qualified to testify as to causation because he is not licensed to practice medicine in the state of Texas and is only licensed to practice medicine in the state of California. *See id.* § 74.001(a)(23)(A) (West Supp. 2015) (defining, in part, "physician" as "an individual licensed to practice medicine in this state"). We disagree. Dr. Harrington ignores a subsequent provision of the statute, section 74.401, which provides that in a suit against a physician, an expert witness must be a physician who is "licensed to practice medicine *in one or more states in the United States*." *Id*. § 74.401(g)(1) (West 2011) (emphasis added). Thus, a physician need not be licensed to practice medicine in the state of Texas to be qualified to provide an expert opinion on causation in an expert report. *See TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 321-22 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Tenet Hospitals Ltd. v. Boada*, 304 S.W.3d 528, 536-39 (Tex. App.—El Paso 2009, pet. denied); *Springer v. Johnson*, 280 S.W.3d 322, 327-28 (Tex. App.—Amarillo 2008, no pet.); *Kelly v. Rendon*, 255 S.W.3d 665, 675 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We therefore conclude that the trial court did not abuse its discretion in finding Dr. Lipson sufficiently qualified to opine on the cause of Ms. Ramos's injuries. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c); *Jones*, 2010 WL 374406, at *2.

*Causation*

Next, we address Dr. Harrington's complaint that the report fails to set out the causal relationship between Dr. Harrington's breaches and the injuries suffered by Ms. Ramos. An expert's report must address the causal relationship between the breach and the injury, harm, or damages. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The expert must "explain the basis of his statements to link his conclusions to the facts." *See Wright*, 79 S.W.3d at 52. Thus, in the present case, Dr. Lipson was required to link Dr. Harrington's alleged negligence to Ms. Ramos's alleged injuries, including the falls she suffered on November 20, 2009 and March 20, 2010, an attack by a fellow resident on February 19, 2011, and ultimately, her death, which resulted from an assault by a fellow resident on July 16, 2012.

Causation is generally established in medical malpractice cases through evidence of a "reasonable medical probability" or "reasonable probability" that the alleged injuries were caused by the negligence of one or more defendants; in other words, the plaintiff must present evidence "that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Jelinek*, 328 S.W.3d at 532-33 (quoting *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399-400 (Tex. 1993)). An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff. *See McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.). An expert report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539-40; *see also Van Ness*, 461 S.W.3d at 142 ("An expert must explain, based on facts set out in the report, how and why the breach caused the injury."). The report must not be conclusory in its explanation of causation; it "must explain the basis of [the expert's] statements to link his conclusions to the facts. *Wright*, 79 S.W.3d at 52; *see also Taylor v. Fossett*, 320 S.W.3d 570, 575 (Tex. App.—Dallas 2010, no pet.) (expert report must

contain sufficiently specific information to demonstrate causation beyond conjecture). An expert's mere conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit*, which the supreme court has consistently criticized. *Jelinek*, 328 S.W.3d at 539.

In his report, Dr. Lipson states that Ms. Ramos endured numerous injuries and problems during her six-year stay at Trisun, including repeated falls, hematomas, a pelvic fracture, a fracture of the left 5th metacarpal, repeated head trauma, continuous threats to her safety by residents, physical altercations with other residents, attacks by other residents, overall physical and mental decline, pain and suffering, mental anguish, and ultimately, intracranial hemorrhage. Ms. Ramos was involved in as many as a dozen physical altercations with other residents during her stay at Trisun. On July 16, 2012, she was pushed by another resident, causing her to fall and suffer a head injury which ultimately resulted in her death two weeks later.

According to Dr. Lipson's report, Dr. Harrington had a duty to assist the facility in providing input into Ms. Ramos's care plan. "When faced with a resident who repeatedly wanders and falls at a facility and a resident who is involved in numerous altercations with other residents and the subject of attacks by other residents, the standard of care requires the physician supervising the medical care of the resident to assist the facility in providing input into the resident's care plan to address these problems." Such input may have included: implementing timed toileting programs, regularly orienting Ms. Ramos with her environment to prevent wandering and confusion, monitoring and readjusting medications, investigating the cause of injuries, lowering her bed, instituting bed rails, maintenance of proper hydration and nutrition, instituting bed alarms, and ordering additional supervision and assistance. In regard to the physical altercations with other residents, Dr. Lipson states that Dr. Harrington should have: "identif[ied] triggers for threats and attacks by other residents, investigat[ed] the cause of the injury/threat and implement[ed] a care

plan to address the cause, remov[ed] Ms. Ramos from close proximity to aggressive residents, and monitor[ed] and modifi[ed] the environment as needed." Dr. Lipson goes on to state that Dr. Harrington breached the standard of care by failing to perform timely and adequate assessments of Ms. Ramos, by failing to document her mental and physical status, and by failing to discharge her from Trisun to another facility when it became clear that Trisun could not meet her needs. Dr. Harrington does not dispute that Dr. Lipson's report adequately sets out the statutory requirements for standard of care and breach, but maintains that the report fails to set forth the causal relationship between Dr. Harrington's alleged breaches of the standard of care and Ms. Ramos's alleged injuries.

In the causation section of his report related to fall injuries sustained by Ms. Ramos, Dr. Lipson states that:

> Ms. Ramos' falls and resulting fractures, and specifically including the 11-20-09 and 3-20-10 falls, were proximately caused in part by the aforementioned breaches of the standard of care by Dr. Harrington. Dr. Harrington failed to properly assess Ms. Ramos, including an assessment of her fall risks, and failed to provide proper input into Ms. Ramos' care plan to address falls and fall risks. If Dr. Harrington had properly assessed Ms. Ramos and provided proper input into Ms. Ramos' care plan to address falls, in some of the ways enumerated above, in reasonable medical probability, Ms. Ramos would not have continued to suffer repeated falls and injuries and would not have suffered the 11-20-09 and 3-20-10 falls.

As to the attacks by fellow nursing home residents, Dr. Lipson states that:

> It is my medical opinion that had . . . Dr. Harrington met the aforementioned standard of care, in all reasonable probability Ms. Ramos would not have suffered continual threats, altercations, and attacks by other residents. Additionally, Ms. Ramos would not have suffered the assault on 2-19-11 that resulted in a large occipital hematoma and she would not have suffered the assault on 7-16-12 that resulted in her death.
>
> If Dr. Harrington had provided appropriate input in regard to the deficiencies in Ms. Ramos' care plan concerning the physical altercations she was involved in with other residents, as required by the standard of care, the care plan for Ms. Ramos would have addressed the issue of resident on resident attacks and measures would have been taken to protect Ms. Ramos from future attacks, such as the measures discussed above. If Ms. Ramos continued to suffer attacks and threats by other

residents and Trisun was unable to keep Ms. Ramos safe, Dr. Harrington should have discharged Ms. Ramos to a facility that could meet her needs. If such measures had been taken, in reasonable medical probability Ms. Ramos would not have been pushed by residents on either 2-9-11 or 7-16-12, and she would not have suffered a large occipital hematoma and intracranial hemorrhage that resulted in her death.

Dr. Lipson's report, when read in its entirety, explains how Ms. Ramos's injuries could have been prevented had Dr. Harrington adhered to the standard of care for a nursing home physician, including instituting bed rails and bed alarms to avoid falls, removing her from close proximity to aggressive residents to avoid being assaulted by fellow residents, and discharging her from Trisun to another facility when it became clear that Trisun could not meet her needs. We are mindful that at this preliminary stage of the proceeding, all that is required is that Dr. Lipson's expert report inform Dr. Harrington of the specific conduct the appellees have called into question and provide a basis for the trial court to conclude that the claims have merit. *See Palacios*, 46 S.W.3d at 879. We conclude the information in Dr. Lipson's report adequately discusses causation so as to inform Dr. Harrington of the conduct that appellees have called into question and to provide a basis for the trial court to conclude that appellees' claims have merit. *See id.*; *see also Jelinek*, 328 S.W.3d at 539. Applying, as we must, the deferential abuse-of-discretion standard of review, we cannot conclude that the trial court acted arbitrarily, unreasonably, and without guiding rules and principles in determining that Dr. Lipson's report provided sufficient information regarding his opinions concerning standard of care, breach, and causation as they relate to the underlying facts, to enable it to determine whether the appellees' claims had merit. *See Hebert v. Hopkins*, 395 S.W.3d 884, 891 (Tex. App.—Austin 2013, no pet.). Therefore, the trial court did not err in denying the motion to dismiss.[1]

---

[1] Appellees' request for damages for frivolous appeal is denied. *See* TEX. R. APP. P. 45.

## CONCLUSION

We affirm the trial court's order denying Dr. Harrington's motion to dismiss.

Rebeca C. Martinez, Justice